# In the United States Court of Federal Claims

No. 20-288C

(Filed: September 24, 2020)

| | |
|---|---|
| **STATE OF OHIO, et al.,**<br><br>                 Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>                 Defendant. | Dispute over charges payable for operation and maintenance under a contract entered pursuant to the Water Supply Act of 1958; timeliness; applicability of the continuing claim doctrine |

Ian F. Gaunt, Assistant Attorney General, State of Ohio, Columbus, Ohio, for plaintiffs. With him on the briefs were Dave Yost, Attorney General, and Daniel J. Martin and Amber Wootten Hertlein, Assistant Attorneys General, State of Ohio, Columbus, Ohio.

Ioana Cristei, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Ethan P. Davis, Acting Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and Daniel Inkelas, Assistant Counsel, Office of the Chief Counsel, United States Army Corps of Engineers.

## OPINION AND ORDER

LETTOW, Senior Judge

This case arises out of a contract entered pursuant to the Water Supply Act of 1958, Pub. L. No. 85-500, Title III, § 301 (codified at 43 U.S.C. 390b), between plaintiff, the State of Ohio, and defendant, the United States Army Corps of Engineers, acting on behalf of the federal government.[1] Contracting under that statute for water supply, Ohio agreed to share the costs of the Corps of Engineers' operation and maintenance of the Caesar Creek Project, a protective flood-control work on Caesar Creek, a tributary of the Little Miami River, in turn a tributary of

---

[1] References to the "United States," the "United States Army Corps of Engineers," and the "Corps" all refer to defendant and its collective entities and actions.

the Ohio River.[2]  The State alleges that the Corps has "charged the State for numerous expenses that were not operation and maintenance costs" that the parties agreed to share under the contract.  Compl. ¶ 29.  Ohio alleges seven causes of action in its complaint, asserting breach of contract (three counts), breach of the implied covenant of good faith and fair dealing, entitlement to declaratory relief, and, in the alternative, violations of the Just Compensation and Due Process Clauses.  Compl. ¶¶ 37-54.  Defendant has moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC").  *See* Def's Mot. to Dismiss ("Def.'s Mot."), ECF No. 9.  After briefing, *see* Pl.'s Resp. to Def.'s Mot., ECF No. 10; Def.'s Reply to Pl.'s Resp., ECF No. 11, the court held a hearing on August 27, 2020.  The motion is ready for disposition.

The court concludes that Ohio's breach of contract claims fall within the six-year statute of limitations, as the continuing claim doctrine applies to the facts at hand.  Therefore, the court has jurisdiction over plaintiff's breach of contract claims.  The court also has jurisdiction over plaintiff's claim of illegal exaction under the Due Process Clause.  Plaintiff has not, however, stated a viable claim under the Just Compensation Clause.  The court defers the motion to dismiss plaintiff's claim for breach of the implied covenant of good faith and fair dealing to the merits of the breach of contract claims.  Accordingly, defendant's motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND[3]

Following the Ohio River flood of 1937, Congress passed the Flood Control Act of 1938, which authorized "the construction of certain public works on rivers and harbors for flood control, and for other purposes."  Pub. L. No. 75-761, 52 Stat. 1215.  Among the rivers identified in the Act was the Little Miami River in Ohio.  A flood control report prepared by the U.S. Army Corps of Engineers for the House Committee on Flood Control identified Caesar Creek, a tributary of the Little Miami River in Ohio, as one of the future sites for "[f]lood control reservoirs for the Ohio River Basin."  H.R. Rep. No. 75-2353, at 11 (1938).

Twenty years later, Congress passed the Water Supply Act of 1958, declaring its policy "to recognize the primary responsibilities of the States and local interests in developing water supplies for domestic, municipal, industrial, and other purposes and that the Federal Government should participate and cooperate with States and local interests in developing such water supplies . . . ."  Pub. L. No. 85-500, § 301(a) (1958) (codified as amended at 43 U.S.C. § 390b(a)).  The Act authorized the U.S. Army Corps of Engineers "to impound water for present or anticipated future demand or need for municipal or industrial water" in its reservoir projects.  43 U.S.C. § 390b(b).  The 1963 Amendments to the Water Supply Act clarified that the water storage rights

---

[2] The Caesar Creek Reservoir or "Project" was authorized by the Flood Control Act of 1938, Pub. L. No. 75-761, 52 Stat. 1215. That Act was prompted by a disastrous flood on the Ohio River in 1937.

[3] The recitations that follow do not constitute findings of fact, but rather are recitals attendant to the pending motions and reflect matters drawn from the complaint, the parties' briefs, and records and documents appended to the complaint and briefs.

of local interests were "subject to performance of its obligations prescribed in such lease agreement or agreement executed in reference thereto." Pub. L. 88-140, § 3 (codified at 43 U.S.C. § 390e). These obligations included continued annual payments for operation and maintenance costs assigned to water supply.

In 1970, the Corps executed a water supply contract with the Ohio Department of Natural Resources relating to the flood control and water supply project at Caesar Creek. *See* Compl. Ex. 1 (the "Contract"). The Contract noted that the Caesar Creek Project was authorized by the Flood Control Act of 1938 and specified a cost-sharing arrangement for the project. *See* Contract. In exchange for water storage space, Ohio agreed to pay "12.70 percent of the annual experienced joint-use operation and maintenance costs of the Project." *See id*. Art. 5.c.(1). The first payment was due within 30 days of the first date the State used the storage space, with subsequent annual payments "due and payable in advance on the 1st day of July" each year. *See id*. Art. 5.c.(2). The charges were to be anticipatory, reflecting the estimated costs for the coming year, and reconciliatory, adjusting for the difference between the previous year's charge and "the actual experienced joint-use costs of operation and maintenance for the prior years." *See id*.

The Contract provides that "[t]he extent of operation and maintenance of the Project shall be determined by the Contracting Officer, and records and accounting shall be maintained by the Contracting Officer. Records of the cost of operation and maintenance of the Project shall be available for inspection and examination by the State." Contract Art. 5.c.(3). Operation and maintenance costs were not defined in the Contract itself, but Exhibit B to the Contract set out "Cost Allocation Studies" for the Project, indicating that the Project was "multiple-purpose," listing "flood control," "water quality control and supply," and "recreation" among the Project's purposes. *Id*. Ex. B, sheet 1.

In 1990, the State of Ohio and the City of Wilmington contracted for the City to receive water from the Caesar Creek Project subject to the provisions of the water supply contract between the State and the Corps. Compl. ¶ 23. The Corps did not begin billing the State under the 1970 water supply contract until 1994. Compl. ¶ 22. In 2004, the State of Ohio and the City of Wilmington amended their contract to provide that the City would reimburse the State for all operation and maintenance costs charged to the State under the water supply contract with the Corps. Compl. ¶ 23.

In 2017, because of increasing costs charged by the Corps, members of Congress, on behalf of the State, "inquired to the Corps about escalating operation and maintenance charges at Caesar Creek." Compl. ¶ 24. The Corps conducted an internal audit and responded that its records revealed "overcharges and undercharges over the past decade for the joint use costs, with a balance of $187,150.07 owed by the State of Ohio." Compl. Ex. 5. The Corps subsequently provided the State with an itemized list of the operation and maintenance costs for its 2015-2016 operations but did not provide such a list for any other year of operations for which the Corps was seeking additional payment. *See* Compl. Ex. 6. In 2018, the Corps provided the State with "reports displaying what it claimed were joint costs and recreation costs for each bill since 2008," and billed the state for the assessed operation and maintenance costs for the coming year along with the $187,150.07 allegedly owed from the past decade. Compl. ¶¶ 28, 32. The bills

themselves do not disclose detailed elements of the charges, but rather state an overall amount due.  *See* Pl.'s Notice, ECF No. 15 (providing invoices from 1994 through 2013); Def.'s Notice, ECF No. 16 (providing invoices from 2014 through 2020).[4]  The State claims that the charges include costs for such items as birdseed, parking lots, travel orders, community outreach, and construction and operation of a Visitor's Center, Compl. ¶ 30, and that some or all of these items are improper, *id*.

The State of Ohio disputed its obligation to pay some of the itemized charges and objected to the entire $187,150.07 retroactive assessment.  Compl. ¶ 33.  The City of Wilmington paid the State "approximately half of the costs assessed" for the 2018 and 2019 bills but refused to pay any of the retroactive assessment.  Compl. ¶ 32 n.2.  After the State failed to make full payment of the assessed charges, the Corps began imposing 1% interest on unpaid amounts allegedly due under the water supply contract, and 6% interest for "any amount the Corps claims is more than 90 days delinquent."  Compl. ¶ 34.  The State disputed these interest charges.  After receiving a Treasury Offset Program delinquency letter regarding the outstanding balance on February 11, 2020, the State paid the remaining balance under protest on February 21, 2020.  Def.'s Mot. at 5.  On March 13, 2020, the State brought suit in this court seeking redress, *see* Compl., and defendant responded by moving to dismiss the action based on lack of jurisdiction and failure to state a claim.

## STANDARDS FOR DECISION

### *A. Rule 12(b)(1) – Lack of Subject-Matter Jurisdiction*

The Tucker Act provides this court with jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  To establish this court's jurisdiction under the Tucker Act, the State of Ohio must "identify a substantive right for money damages against the United States separate from the Tucker Act."  *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004).

The State of Ohio, as plaintiff, must establish jurisdiction by a preponderance of the evidence.  *See Trusted Integration, Inc. v. United States,* 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed. Cir. 1988)).  When ruling on the government's motion to dismiss for lack of jurisdiction, the court must "accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Id.* (citing *Henke v. United States,* 60 F.3d 795, 797 (Fed. Cir. 1995)).  Furthermore, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."  28 U.S.C. § 2501.  This six-year statute of limitations "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be

---

[4] At the hearing held on August 27, 2020, the court requested that the parties file as a supplement to their briefing copies of the bills rendered by the Corps to the State, and the parties promptly did so.

strictly construed." *Dalles Irrigation Dist. v. United States*, 71 Fed. Cl. 344, 350 (2006) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988)).

### B. Rule 12(b)(6) – Failure to State a Claim Upon Which Relief Can Be Granted

Under RCFC 12(b)(6), a complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual matters alleged "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citations omitted).

When reviewing the complaint, "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986)) (additional citation omitted). Conclusory statements of law and fact, however, "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" are insufficient to state a claim. *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557); *accord Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

## ANALYSIS

### A. The State of Ohio's Claims for Breach of Contract

The Corps avers that the six-year statute of limitations on the State of Ohio's claim, *see* 28 U.S.C. § 2501, began to accrue in 1994, when the Corps first billed the State under the water supply contract, Def.'s Mot. at 12. The Corps further contends that the continuing claim doctrine does not apply in this case because "there is no series of independent and distinct events or wrongs that the State can, or has, pointed to" in its breach of contract claims. *Id.* The State of Ohio counters that the continuing claim doctrine applies to these facts, and that the Corps' statute of limitations argument is "essentially identical" to the argument rejected by this court in *Dalles Irrigation*, 71 Fed. Cl. 344. Pl.'s Resp. at 6.

This court may exercise subject matter jurisdiction over a claim if it "is filed within six years after such claim first accrues." 28 U.S.C. § 2501. A claim accrues within the meaning of the statute of limitations "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Dalles Irrigation*, 71 Fed. Cl. at 351 (quoting *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1455 (Fed. Cir. 1997)). A motion to dismiss a claim for failure to meet the statute of limitations will be analyzed under RCFC 12(b)(1), as Section 2501 imposes a "jurisdictional requirement." *See id.* at 350 (quoting *Hopland Band*, 855 F.2d at 1576-77).

5

The continuing claim doctrine applies to a claim that is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park*, 127 F.3d at 1456. In contrast, "a claim based on a single distinct event, which may have continued ill effects later on, is not a continuing claim." *Id.*; *see also Park Properties Assocs., L.P. v. United States*, 74 Fed. Cl. 264, 271 (2006) (holding that the continuing claim doctrine was not applicable to a claim of breached housing assistance payment contracts, as the claim "involve[d] . . . the effects of events that occurred more than six years prior"). The continuing claim doctrine has traditionally been applied when a "wrong constituted an alleged violation of a statute or regulation that accrued when that particular wrong occurred, independent of the accrual of other wrongs." *Brown Park*, 127 F.3d at 1457. This court has also applied the continuing claim doctrine to government contract disputes when the "claim may be broken down into yearly segments in determining whether the government did in fact breach its duties under the contract." *Dalles Irrigation*, 71 Fed. Cl. at 353. A distinct claim results and "a new statute of limitations accrue[s] every time the government fail[s] to satisfy its annual contractual obligations." *Id.* at 352.

The Corps asserts that the State's claims fall outside of the statute of limitations, as the Corps first billed the State under the water supply contract in 1994 and has used the same formula for calculating operation and maintenance costs each year. Def.'s Mot. at 10. The State points to *Dalles Irrigation* in arguing that the Corps had an annual duty to calculate the operation and maintenance costs. Pl.'s Resp. at 8-9. The State further maintains that its claims "accrued no earlier than 2017, when the State first learned" of the charges now in dispute. *Id.* at 7.

The State of Ohio's claims for breach of contract may be broken down into a "series of independent and distinct events," *see Brown Park*, 127 F.3d at 1456, as the water supply contract imposed an annual duty on the Corps to calculate the costs of operating and maintaining the Caesar Creek Project. The Contract states that the Corps' annual charges to the State are to "be increased or decreased in an amount to reflect the difference between the prior payment for operation and maintenance and the actual experienced joint-use costs . . . for the prior years." Contract Art. 5.c(2). Just as the claim in *Dalles Irrigation* was "based on a breach of the [d]efendant's annual duty under . . . the . . . [c]ontract," the State of Ohio seeks damages pursuant to a contract which specifies that the Corps will make annual adjustments to charges. *See Dalles Irrigation*, 71 Fed. Cl. at 350 (second alteration in original) (citation omitted). Thus, any unauthorized charges under the water supply contract will give rise to "a distinct claim every year" that such charges are made. *See id.* at 352. Furthermore, "[a]ccrual of a claim is determined under an objective standard and plaintiff does not have to possess actual knowledge of all the relevant facts in order for a cause of action to accrue." *Lake Borgne Basin Levee Dist. v. United States*, 127 Fed. Cl. 321, 334 (2016) (internal citations omitted). In this case, the application of the six-year statute of limitations is measured from the date the State of Ohio filed its complaint in this court, March 13, 2020. *See* 28 U.S.C. § 2501. Given that Ohio was first made aware of the retroactive assessment of $187,150.07 it allegedly owed to the Corps in 2017, restating the charges the Corps had levied over the prior decade, Compl. ¶ 25, and that the Corps billed the State for this balance in 2018, Compl. ¶ 32, the State's claims for breach of contract fall within the six-year statute of limitations.

The Corps also moved to dismiss the State of Ohio's claim for declaratory relief on the grounds that the court lacks jurisdiction to award such relief in this case. Def.'s Mot. at 8-9. The Corps argues that the State's claim for declaratory relief is a request for a "stand-alone judgment." *Id.* at 9. That contention assumes that the State of Ohio has no viable claim for monetary relief. Ohio has, however, requested monetary relief as its primary demand, and the court has the "authority to issue rulings of law declaring the rights of parties under a contract where such rulings are necessary to the resolution of a claim for money presently due and owing." *Hydrothermal Energy Corp. v. United States*, 26 Cl. Ct. 7, 16 (1992).

Here, the State requests "a ruling that defines the Corps' contractual obligations as set in 1970 and continuing for as long as the water supply contract is in force—which in turn defines the money-damages owed by the Corps to the State." Pl.'s Resp. at 21. The "claim[s] for money presently due and owing" in this case, *see Hydrothermal Energy*, 26 Cl. Ct. at 16, are the State's claims for the operation and maintenance charges billed by the Corps. The declaratory relief sought by the State may or may not be appropriate, depending upon the ultimate resolution of the breach-of-contract claims. A ruling determining whether particular charges were authorized will inevitably determine the Corps' right to bill the State for such charges. Therefore, this court has jurisdiction over the State's claim for declaratory relief.

### B. The State of Ohio's Claim for Illegal Exaction

"[T]o establish Tucker Act jurisdiction for an illegal exaction claim, a party that has paid money over to the government and seeks its return must make a non-frivolous allegation that the government, in obtaining the money, has violated the Constitution, a statute, or a regulation." *Boeing Co. v. United States*, 968 F.3d 1371, 1383 (Fed. Cir. 2020). In *Boeing*, the Federal Circuit noted that "[o]ne way an illegal exaction occurs . . . is when the plaintiff has paid money over to the Government . . . and seeks return of all or part of that sum that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or regulation." *Id.* (internal quotations omitted). Furthermore, "[a]llegations of subject matter jurisdiction, to suffice, must satisfy a relatively low standard" and merely "exceed a threshold that has been equated with such concepts as 'essentially fictitious,' 'wholly insubstantial,' 'obviously frivolous,' and 'obviously without merit.'" *Id.* (quoting *Shapiro v. McManus*, --- U.S.----, ----, 136 S. Ct. 450, 456 (2015)).

The State of Ohio's claim for illegal exaction is made in the alternative to its claims for breach of contract. The State alleges that the Corps "has illegally exacted some of the charges" assessed under the Water Supply Act in violation of the Fifth Amendment of the U.S. Constitution. Compl. ¶ 54. The Corps asserts that the State's failure to identify a money-mandating provision in either the Water Supply Act or the Fifth Amendment dooms its claim for illegal exaction. *See* Def.'s Reply at 14-15. However, the Federal Circuit clarified in *Boeing* that "the requirement of a 'money-mandating' statute only [applies] to claims for money damages for government action *different from* recovery of money paid over to the United States under an illegal exaction." *Boeing*, 968 F.3d 1383 (emphasis added). The State has made a "non-frivolous" allegation of illegal exaction in its complaint and need not identify a money-mandating statutory provision or contract. The Corps' interest charges arguably fall within this

7

jurisdictional predicate, wholly apart from Ohio's contractual claims. Therefore, under *Boeing*, this court has jurisdiction over the State's claim for illegal exaction.

### C. The State of Ohio's Claim Under the Just Compensation Clause

"[T]he concept of a taking as a compensable claim has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (quoting *Sun Oil Co. v. United States*, 215 Ct. Cl. 716, 770 (1978)).

The Corps seeks dismissal of the State of Ohio's alternative claim under the Just Compensation Clause, averring that the State has failed to state a plausible takings claim. *See* Def.'s Mot. at 17-18. The State of Ohio grounds its takings claim in the Corps' alleged breach of the water supply contract. *See* Compl. ¶ 52. The Corps' charges, whether authorized or not, were levied pursuant to the contract it executed with the State. Therefore, the Corps' alleged "interference with . . . contractual rights" under the water supply contract, *see Hughes Commc'ns Galaxy*, 271 F.3d at 1070, gives rise to a breach-of-contract claim, but not a takings claim. The State has thus failed to state a viable claim under the Just Compensation Clause.

### D. The Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

The State claims that the Corps breached the implied covenant of good faith and fair dealing in its performance under the water supply contract. Compl. ¶ 46. The Corps moved to dismiss this claim under RCFC 12(b)(6), arguing that the State failed to identify a "'specific promise' that was 'undermined' by the alleged breach . . . ." Def.'s Mot. at 16 (quoting *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019)). At this early juncture in the litigation, this claim is difficult to address and resolve because insufficient facts are before the court regarding the elements of the Corps' operation and maintenance assessments, the nexus of particular elements to the Corps' pertinent activities at and for the Project, and the consistency with which the Corps applied functional relevance criteria over years. The court therefore defers the motion to dismiss plaintiff's claim for breach of the implied covenant of good faith and fair dealing to the merits of the breach of contract claims.

### CONCLUSION

For the reasons set forth above, the United States' motion to dismiss is GRANTED IN PART and DENIED IN PART. The motion is granted insofar as the takings claim is concerned but is otherwise denied. The United States shall file an answer to the complaint regarding the claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and illegal exaction on or before October 15, 2020.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge
