# In the United States Court of Federal Claims

No. 20-288C

(Filed: June 21, 2021)

| | |
|---|---|
| **STATE OF OHIO**, | Suit for breach of contract; contract based on Water Supply Act of 1958, as amended, 43 U.S.C. § 390(b); cross-motions for partial summary judgment |
| Plaintiff, | |
| v. | |
| **UNITED STATES**, | |
| Defendant. | |

Ian F. Gaunt, Assistant Attorney General, Environmental Enforcement Division, State of Ohio, Columbus, Ohio, for plaintiff. With him on the briefs were Dave Yost, Ohio Attorney General, Daniel J. Martin, and Amber Wootton Hertlein, Assistant Attorneys General, State of Ohio, Columbus, Ohio.

Ioana Cristei, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Brian M. Boynton, Acting Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., as well as Daniel Inkelas, Assistant Counsel, Office of the Chief Counsel, and Lauren R. Horner, Assistant District Counsel, Louisville District, United States Army Corps of Engineers.

## OPINION AND ORDER

LETTOW, Senior Judge.

The State of Ohio seeks redress for the United States Army Corps of Engineers' alleged violation of a contract relating to flood control and water supply at the Caesar Creek Project (the "Project") in Southwestern Ohio. The contract, executed by Ohio and the Corps in 1970 pursuant to the Water Supply Act of 1958, Pub. L. No. 85-500, Title III, § 301 (codified at 43 U.S.C. § 390b), stipulated that the parties would share the "annual experienced joint-use operation and maintenance costs of the Project." First Am. Compl. Ex. A Art. 5.c.(1) (the "Contract"), ECF No. 23-2. Ohio alleges, *inter alia*, that "[t]he United States has charged—and continues to charge—the State of Ohio for costs not authorized by the . . . Contract." First Am. Compl. ¶ 45, ECF No. 23-1.

Pending before the court are the parties' cross-motions for partial summary judgment. *See* Pl.'s Mot. for Partial Summ. J. ("Pl.'s Mot."), ECF No. 26; Def.'s Resp. & Cross-Mot. for Partial Summ. J. ("Def.'s Cross-Mot."), ECF No. 32. Following the completion of briefing, *see* Pl.'s Reply & Resp. ("Pl.'s Reply"), ECF No. 33; Def.'s Reply, ECF No. 36, the court held a hearing on May 21, 2021. The court concludes that "joint-use operation and maintenance costs of the Project," Contract Art. 5.c.(1), are those necessary "to maintain [the Project] as an efficient going concern," *Nampa & Meridian Irrigation Dist. v. Bond*, 268 U.S. 50, 53 (1925), *i.e.*, "to operate [the Project] effectively" for water storage, water availability, and flood control, *id.*, and "to remedy injurious effects resulting from the [P]roject's subsequent operation," *Casitas Municipal Water Dist. v. United States*, 543 F.3d 1276, 1284 (Fed. Cir. 2008). Because allegedly extraneous costs are at issue, plaintiff's motion is GRANTED IN PART and the government's cross-motion is DENIED.

## BACKGROUND[1]

### A. The Flood Control Act and the Water Supply Act

The Flood Control Act of 1938 "[a]uthoriz[ed] the construction of certain public works on rivers . . . for flood control, and for other purposes." Pub. L. No. 75-761, 52 Stat. 1215. Congress passed the Act in response to the Ohio River flood of 1937, *see Ohio v. United States*, 150 Fed. Cl. 173, 176 (2020), and the Little Miami River in Ohio, of which Caesar Creek is a tributary, was identified as an appropriate site for a future reservoir in the Ohio River Basin, *see id.*; *see also* H.R. Rep. No. 75-2353, at 11 (1938). The Act specifically references the plan for the Ohio River Basin as a "general comprehensive plan for flood control and other purposes." 52 Stat. at 1217. Congress further adopted the Water Supply Act of 1958, and the Act's 1963 amendments, for a similar purpose, *see* Pub. L. No. 85-500, § 301(a) (1958) (codified as amended at 43 U.S.C. § 390b(a)); Pub. L. No. 88-140, 77 Stat. 249, and "authorized the U.S. Army Corps of Engineers 'to impound water for present or anticipated future demand or need for municipal or industrial water' in its reservoir projects." *Ohio*, 150 Fed. Cl. at 176 (quoting 43 U.S.C. § 390b(b)). The Water Supply Act, as amended, briefly addresses operation and maintenance costs, asserting that a state such as Ohio can obtain permanent rights to water storage space so long as the state "continue[s] payment of annual operation and maintenance costs allocated to water supply." Pub. L. No 88-140, § 3 (codified at 43 U.S.C. § 390e).

### B. The Contract

In January of 1970, the parties established a flood control contract related to the Caesar Creek Reservoir Project in Ohio. Contract at 1. The Contract was entered pursuant to the Flood Control Act of 1938 and the Water Supply Act of 1958 to manage water supply needs and reduce flooding risks along various rivers, including the Little Miami River in Ohio. *See id.* The Corps

---

[1] The recitations that follow are not findings of fact but rather are recitals attendant to the pending motions and reflected matters drawn from the complaint, the parties' briefs, and the records and documents appended to the complaint and briefs.

agreed to operate and enhance the Caesar Creek Project by adding water storage capabilities and supply. *See id.* Art. 1.d. Under the Contract, Ohio gained "the right . . . to utilize an undivided 48.7 percent of the storage space in the Project between elevations 800.0 and 846.0 feet above mean sea level as deemed necessary by the State to impound water for municipal and industrial use and to make withdrawals therefrom at any time," a storage space "estimated to be 80,400 acre-feet." *Id.* Art. 1.a.

Article 5 of the Contract provided that Ohio agreed to pay the United States a variety of costs, including a portion of the Project's operation and maintenance costs. Contract Art. 5. Specifically, the Contract stated that "[t]he State shall pay 12.70 percent of the annual experienced joint-use operation and maintenance costs of the Project" on an annual basis. *Id.* Art. 5.c.(1). The Contract did not define what costs could be considered operation and maintenance costs, but it did provide that the United States' contracting officer possessed discretion to determine the appropriate amount of operation and maintenance costs. *Id.* Art. 5.c.(3). Ohio could request additional operation and maintenance, but the State would be responsible for "the entire cost of such additional expense." *Id.*

### C. Procedural History

Ohio filed suit in this court in March 2020. *See* Compl., ECF No. 1. Among other claims, Ohio disputed numerous "facially improper line items" charged by the Corps as operation and maintenance expenses. Compl. ¶ 30; *see also* First Am. Compl. ¶ 30. Ohio specifically challenged charges related to "birdseed, parking lots, pedestrian bridges, environmental management, water quality testing, travel orders, tree removal, and community outreach." First Am. Compl. ¶ 30. Ohio anticipated identifying additional improper charges because "[m]any other expense items lacked sufficient detail to determine whether they relate to operation and maintenance for the flood control and water supply [P]roject." First Am. Compl. ¶ 31.

The government subsequently moved to dismiss the complaint. Def.'s Mot. to Dismiss, ECF No. 9. The court granted the government's motion in part, dismissing Ohio's takings claim, but otherwise denied the motion. *See Ohio*, 150 Fed. Cl. 176. Ohio filed its first amended complaint on February 8, 2021. *See* First Am. Compl.; Order of February 8, 2021, ECF No. 24. The government filed its answer to the amended complaint on February 22, 2021. *See* ECF No. 25. Four days later, Ohio filed its motion for partial summary judgment, contending that it "is entitled to partial summary judgment on the scope of the water supply contract's definition of 'joint-use operation and maintenance costs of the Project' as a matter of law." Pl.'s Mot. at 5. The government filed a response and cross-motion for partial summary judgment, in which it countered that "Ohio is obligated to pay 12.7 percent of the annual joint-use operation and maintenance expenses that the contracting officer deems necessary to operate and maintain the [P]roject for its authorized purposes." Def.'s Cross-Mot. at 12-13. The cross-motions were fully briefed, *see* Pl.'s Reply; Def.'s Reply, and the court held a hearing on May 21, 2021.[2]

---

[2] The transcript of the hearing was filed on June 1, 2021 and will be cited as "Hr'g Tr. Page Number:Line Number," omitting the hearing date from the citation.

3

## STANDARDS FOR DECISION

### *A. Summary Judgment*

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC"). A material fact is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (interpreting Fed. R. Civ. P. 56).[3] A genuine dispute exists when the finder of fact may reasonably resolve the dispute in favor of either party. *Id.* at 250.

The movant bears the burden of demonstrating the absence of any genuine disputes of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), and must "cite[] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," RCFC 56(c)(1)(A). The court may consider other materials in the record even if not cited by the parties. RCFC 56(c)(3). "[T]he inferences to be drawn . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). If the record taken as a whole "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment is appropriate. *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

When both parties have moved for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (citation omitted). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Id*. "To the extent there is a genuine issue of material fact, both motions must be denied." *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 969 (Fed. Cir. 2009) (citation omitted).

### *B. Interpretation of Contracts on Summary Judgment*

The meaning of contract terms properly can be evaluated on summary judgment, provided that the contractual language is not ambiguous. *See Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 717 (Fed. Cir. 2008); *Crown Laundry & Dry Cleaners v. United States*, 29 Fed. Cl. 506, 515 (1993) (citation omitted) ("Pure contract interpretation is a question of law which may be resolved on summary judgment."). In interpreting a contract, a court begins with the language of the agreement. *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000*); Record Steel & Constr., Inc. v. United States*, 62 Fed. Cl. 508, 513 (2004). If the terms of

---

[3] Because RCFC 56 mirrors Fed. R. Civ. P. 56, the rules should be interpreted *in pari materia*.

4

the contract are unambiguous, the court must give effect to the plain meaning and may not look to extrinsic evidence as an interpretative guide. *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004). In interpreting a contract, the court is to read the contract as a whole and endeavor to give a reasonable meaning to all its provisions. *Jowett*, 234 F.3d at 1368 (citations omitted).

Further, where a contract fulfills or implements a statutory requirement, the underlying statute must guide the court's interpretation of the contract. *Dalles Irrigation Dist. v. United States*, 82 Fed. Cl. 346, 355 (2008). In these circumstances, "the express terms of the . . . contract are illuminated by the authorizing legislation . . . and, to a lesser extent, by other background legislation." *Id.* at 355-56. As the Federal Circuit has explained: "[W]hen . . . the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." *Columbus Reg'l Hosp. v. United* States, 990 F.3d 1330, 1345 (Fed. Cir. 2021) (quoting *Roedler v. Department of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001)).

## ANALYSIS

### *A. Ohio's Motion for Summary Judgment*

Ohio seeks partial summary judgment, requesting that the court adopt a definition of the contractual term "joint-use operation and maintenance costs of the Project." Pl.'s Mot. at 5. Ohio argues that the Contract imposes two limitations on the operation and maintenance costs: first, that "[t]he costs charged to the State must be for operation and maintenance," and second, that "the costs charged to the State for operation and maintenance must be for the shared Caesar Creek Project." *Id.* Under Ohio's definition, operation and maintenance costs must be "related to flood control, water storage, and water supply," *id.* at 7, and be spent "to operate and keep the [P]roject in working order or fix problems caused by the [P]roject," *id.* at 5. Ohio avers that the plain language of the Contract controls, and that the authorizing statutes and their legislative histories inform its arguments. *Id.* at 5-13. The United States counters that, in support of its proposed definition, Ohio relies on extrinsic evidence. Def.'s Cross-Mot. at 7-11. By using this evidence, the United States asserts that Ohio implicitly concedes that the contract language is ambiguous. *Id.* at 7-11.

The starting point for this analysis is the contractual language. The Contract provides that the Project is "the Caesar Creek Reservoir on Caesar Creek, a tributary of the Little Miami River," construction of which "was authorized by the Flood Control Act" of 1938 and would include "storage for municipal and industrial water supply." Contract at 1. The Project is listed as a "multi-purpose project" with the goals of "flood control," "water quality control," and "water supply." *Id.* Ex. B (emphasis omitted). Ohio agreed to pay costs in accordance with the provisions of the Water Supply Act of 1958, as amended. *Id.* at 1. Among other costs, the Contact specified that Ohio "shall pay 12.70 percent of the annual experienced joint-use operation and maintenance costs of the Project." *Id.* at Art. 5.c.(1). Further, the contracting officer had discretion to determine "[t]he extent of operation and maintenance of the Project" and would provide records of such costs to Ohio "for inspection and examination." *Id.* at Art. 5.c.(3). Ohio would "bear the entire cost" of operation and maintenance expenses that were above those "deemed necessary by the Contracting Officer." *Id.*

5

The parties' arguments center around questions of the proper scope of the Project, the definition of operation and maintenance costs, and the definition of joint use. Ohio argues that the plain language of the Contract, binding precedent, and the associated statutes should guide the court's analysis.[4] The government avers, however, that the plain language of the Contract provides substantial discretion to the contracting officer to decide what charges count as operation and maintenance.

The court finds that the contractual language plainly places requirements on what can be operation and maintenance costs for which Ohio is obligated to pay. Operation and maintenance costs must be "joint-use" and they must be "of the Project." Contract Art. 5.c.(1). While the United States is correct that the contracting officer retains discretion as to the appropriate amount of operation and maintenance costs to charge Ohio, *see* Def.'s Cross-Mot. at 12-13; Contract Art. 5.c.(3), the contracting officer does not have discretion to determine the definition of the Project and attendant joint-use costs. Accordingly, the contracting officer cannot charge Ohio for costs that are not joint use, not for operation and maintenance, or not related to the Caesar Creek Project.

The parties focus on the definition of "joint use" in delineating the operating and maintenance expenses that can be charged to Ohio under the contract. The government states that joint use means that the costs can have "two or more purposes," Hr'g Tr. 23:3-4, while Ohio implies that joint-use instead should be understood in the context of the shared Project at Caesar Creek, *see* Pl.'s Reply at 4; *see also* Hr'g Tr. 21:4-8 (United States: "[Ohio] also name[s] something that [it] call[s] the 'shared project,' but that's not actually found anywhere in the contract, and nor does Ohio explain what this mean or if this is something that's different from 'joint use,' which is, in fact, found in the [C]ontract.").

The Contract contrasts "joint-use" with "specific-use." *See, e.g.*, Contract Ex. B, Sheet 5 (line item 23 "Allocated construction costs of joint-use lands & facilities" lists multiple purposes, such as flood control, water quality and water supply, and recreation, while line item 24 "Construction costs of specific-use lands & facilities" has a single purpose, recreation).[5] In short, joint-use costs refer to expenses which serve multiple purposes, while specific-use costs

---

[4] The language defining the Project, including the incorporation of the authorizing statutes, is stated in the contract's recitals. *See* Contract at 1. Ohio indicated that it believes the recitals "comport with [its] analysis of the rest of the contract." Hr'g Tr. 9:24 to 10:1. While courts generally "do not interpret recitals as binding contractual obligations," *Rocky Mountain Helium, LLC v. United States*, 145 Fed. Cl. 662, 666 n.6 (2019) (citation omitted), recitals "may be read in conjunction with the operative portions of a contract in order to ascertain the intention of the parties." *KMS Fusion, Inc. v. United States*, 36 Fed. Cl. 68, 77 (1996), *aff'd*, 108 F.3d 1393 (Fed. Cir. 1997). Therefore, the court will read the recitals together with the contract language to discern the meaning of the contractual terms at issue.

[5] At this juncture, the court need not resolve the question of whether the sheets appended to Exhibit B of the Contract are actually part of the Contract itself. For purposes of the cross-motions, the court will take them into account.

refer to expenses for recreational purposes only. *See id.* Looking at the Contract as a whole, *Jowett*, 234 F.3d at 1368, the court determines that the Contract defines "joint-use" as pertaining to more than one contractually specified use and that this definition applies throughout the Contract.

The court next turns to the core argument—the definition of operation and maintenance. The Contract does not provide a direct definition of operation and maintenance costs, other than the statements included in Article 5. *See* Contract Art 5.c. Both parties rely on *Nampa & Meridian Irrigation District v. Bond*, 268 U.S. 50 (1925), and *Casitas Municipal Water District v. United States*, 543 F.3d 1276 (Fed. Cir. 2008), in support of their arguments. *See, e.g.*, Pl.'s Mot. at 6; Def.'s Cross-Mot. at 12. In *Nampa*, the Supreme Court of the United States provided a definition for what could be considered an operation and maintenance charge. *Nampa*, 268 U.S. at 53. Generally, costs are considered "maintenance and operating expenses" when those "expenditures [are] made to maintain [the system] as an efficient going concern, and to operate it effectively to the end for which it was designed." *Id.* The Federal Circuit, relying upon *Nampa*, further stated that "costs . . . incurred after the project was completed to remedy injurious effects resulting from the project's subsequent operation" were properly characterized as operation and maintenance costs. *Casitas*, 543 F.3d at 1284. Costs of the initial construction of the Project, for example, could not be charged as operation and maintenance, but later remedial construction could be classified as such. *See id.* at 1283-84. Accordingly, expenses charged to Ohio as operation and maintenance costs must be (1) "to maintain [the Project] as an efficient going concern," *Nampa*, 268 U.S. at 53, (2) "to operate [the Project] effectively to the end[s] for which it was designed," *id.*, or (3) "to remedy injurious effects resulting from the [P]roject's subsequent operation," *Casitas*, 543 F.3d at 1284.

The purposes and goals of the Project are relevant to this analysis both as to the scope "of the Project" as well as to whether expenses are, in fact, "operation and maintenance costs." *See* Contract Art. 5.c.(1). The Contract provides that "construction" of the Project and "storage" of water "for municipal and industrial water supply," *id.* at 1, as well as "flood control," and "water quality control," *id.* Ex. B, are purposes of the Project. The court's analysis is further informed by the authorizing statutes referenced by the contract. *See Dalles Irrigation*, 82 Fed. Cl. at 355 ("[T]he express terms of the . . . contract are illuminated by the authorizing legislation."). The parties agree that the underlying legislation is relevant and important to proper resolution of this issue. *See* Hr'g Tr. 25:4-6 (United States: "[T]he underlying legislation is absolutely important to look at in making this determination."); *id.* 11:2-5 (Ohio: "Our position is that [the statutes] . . . are helpful guidance in interpreting the contract."). The Flood Control Act of 1938 authorized construction, such as the Caesar Creek Project, "for flood control, and for other purposes." Pub. L. No. 25-761, 52 Stat. 1215. The declared policy of the Water Supply Act of 1958 was to "develop[] water supplies for domestic, municipal, industrial, and other purposes" and to facilitate cooperation "in connection with construction, maintenance, and operation of Federal navigation, flood control, irrigation, or multiple purpose projects." 43 U.S.C. § 390b(a). The statutory provisions authorizing the parties to enter into this Contract, combined with *Nampa* and *Casitas*, indicate that "operation and maintenance costs" should be interpreted as those necessary "to maintain [the Project] as an efficient going concern" "to operate [the Project] effectively" for the Project's water storage, water availability, and flood control purposes, or "to remedy injurious effects resulting from the [P]roject's subsequent operation." *Nampa*, 268 U.S. at 53; *Casitas*, 543

F.3d at 1284.[6] Expenses that fit within the above definition can be properly charged as operation and maintenance expenses.

The United States suggests that the definition of operation and maintenance cannot be determined absent discovery as to the specific charges Ohio alleges it was wrongly charged as operation and maintenance. Def.'s Cross-Mot. at 12 ("Additional discovery is needed to determine both the costs at issue and any facts rendering those costs not properly chargeable under the contract.") The government argues that, as the Supreme Court stated in *Nampa*, "[t]he same kind of work under one set of facts may be chargeable to construction and under a different set of facts may be chargeable to maintenance and operation." *Nampa*, 268 U.S. at 54 (citation omitted); *see also Nampa & Meridian Irrigation Dist. v. Bond*, 288 F. 541, 541 (9th Cir. 1923), ("[T]he term 'operating expense' is a broad and comprehensive one, and its meaning in a given case depends on the nature and amount of the expenditure, and all the surrounding circumstances."), *aff'd*, 268 U.S. 50. Therefore, the United States avers that the court cannot establish a definition for this contract term absent knowledge of the specific costs alleged to be inappropriately charged. Def.'s Cross-Mot. at 12. The court finds, however, that adopting a definition for joint-use operation and maintenance costs does not run afoul of *Nampa*. Contrary to the government's suggestion that granting summary judgment for Ohio requires this court to decide "what costs this contract language applies to," Def.'s Reply at 2, providing a working definition of the contractual term at issue here does not determine whether the specific charges Ohio challenges are properly chargeable as operation and maintenance. Those determinations require a factual record currently being developed through discovery and, as such, would be inappropriate for the court to evaluate on summary judgment. *See Anderson*, 477 U.S. at 248 ("[T]he requirement is that there be no genuine dispute of material fact.") (emphasis omitted).

The United States further contends that by granting summary judgment, the court is issuing an advisory opinion because it does not resolve "any claim or part of a claim." Def.'s Cross-Mot. at 11. The United States is correct that Rule 56 of the Rules of the Court of Federal Claims provides that a party moving for summary judgment must "identify[] each claim or defense—or the part of each claim or defense—on which summary judgment is sought." RCFC 56(a); *see* Def.'s Cross-Mot. at 11. Nonetheless, a grant of partial summary judgment to Ohio would not offend Rule 56. Ohio's suit seeks to establish that the United States is incorrectly overcharging it for joint-use operation and maintenance costs under the Contract, *see* First. Am. Compl. ¶¶ 23-36, 43-45, and Ohio's motion for summary judgment clarifies part of this claim by establishing a definition for this contractual term, *see generally* Pl.'s Mot. The government's argument as to Rule 56, therefore, lacks merit.

---

[6] The Contract provides that the costs must be for operation and maintenance of the Project. Thus, operation and maintenance costs can apply to "only . . . expenses necessary to operate and maintain the flood control, water supply, and water storage [P]roject." Pl.'s Mot. at 7.

*B. United States' Motion for Summary Judgment*

The government seeks partial summary judgment, requesting that the court find "that Ohio is obligated to pay 12.7 percent of the annual joint-use operation and maintenance expenses that the contracting officer deems necessary to operate and maintain the [P]roject for its authorized purposes." Def.'s Cross-Mot. at 12-13. Ohio agrees with the United States' interpretation insofar as it correctly quotes the contractual language. Pl.'s Reply at 2 ("To the extent that the Government quotes the language of the [C]ontract, Ohio agrees that the [C]ontract says what the [C]ontract says.") Ohio suggests that the United States' request comports with a grant of summary judgment for Ohio because "the Government does not identify any interpretation other than the one Ohio asks this Court to confirm." *Id.* The court agrees. As the court previously stated, *see supra*, the Contract does not grant the contracting officer discretion to define operation and maintenance or joint use as contractual terms, but rather he or she can determine the appropriate amount of expenses necessary to operate and maintain the Project and then charge Ohio accordingly. The United States' request, therefore, goes beyond the plain language of the Contract.

## CONCLUSION

Under the Contract, joint-use operation and maintenance costs are those necessary "to maintain [the Project] as an efficient going concern," *Nampa*, 268 U.S. at 53, "to operate [the Project] effectively" for water storage, water availability, and flood control, *id.*, or "to remedy injurious effects resulting from the [P]roject's subsequent operation," *Casitas*, 543 F.3d at 1284, that pertain to more than one purpose of the Project. Therefore, plaintiff's motion is GRANTED IN PART, and the government's cross-motion is DENIED.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge