# In the United States Court of Federal Claims

|  |  |
|---|---|
| STATE OF OHIO, | No. 20-288C |
| *Plaintiff,* | (Filed: October 7, 2022) |
| v. | Contract; Motion to Dismiss; Summary Judgment; Statute of Limitations; Declaratory Relief; Implied Covenant of Good Faith; Pre-Judgment Interest |
| THE UNITED STATES OF AMERICA, | |
| *Defendant.* | |

*Ian Gaunt*, Office of the Attorney General of the State of Ohio, Columbus, OH, for Plaintiff.

*Ioana Cristei*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER

**LERNER,** *Judge*.

## I.      Background

### A.      Factual Background

This case concerns a dispute over a 1970 contract for dam construction, water storage, and water supply ("the Contract" or "the Water Supply Contract") between the State of Ohio (acting through the Ohio Department of Natural Resources ("ODNR")) and the United States (acting through the Army Corps of Engineers ("the Corps")). Pl.'s Ex. 1 ("Water Supply Contract") at USA000008, ECF No. 65-1. The Contract provides for the construction of the Caesar Creek Reservoir ("the Project") and entitles Ohio to a certain portion of the water supply and storage that the Project's dam and reservoir enable. *Id.* at USA000001. In addition to other payments not at issue, the Contract dictates that Ohio "shall pay 12.70 percent of the annual experienced joint-use operation and maintenance costs of the Project." *Id.* at USA000004. The Contract does not define the terms "joint-use" or "operation and maintenance" ("O&M").

In 1990, Ohio subcontracted with the City of Wilmington, Ohio, to supply the city water from Caesar Creek Reservoir. Pl.'s Ex. 9 ("the Wilmington Contract") at OH_000202–231, ECF No. 65-9. A 2004 amendment to the agreement provided that Wilmington would reimburse Ohio for all O&M costs that the United States charges Ohio under the Water Supply Contract. *Id.* at OH_000224. In 1994, the Project started to supply water, and annual billing began under the Corps' contract with Ohio. Pl.'s Mot. for Summ. J. on Liability ("Pl.'s Mot.") at 5 (citing

Answer ¶ 22, ECF No. 25), ECF No. 65; Pl.'s Ex. 1 (invoices for Caesar Creek O&M, 1994–2013) at 1, ECF No. 15-1.

In 2017, Wilmington expressed concerns about rising O&M costs.  Pl.'s Ex. 10, ECF No. 65-10 (letter from mayor of Wilmington to Rep. Steve Stivers).  Members of Ohio's congressional delegation inquired into the cost increases, which led the Corps to conduct an audit.  Pl.'s Ex. 11, ECF No. 65-11 (Rep. Stivers letter to Corps); Pl.'s Ex. 12, ECF No. 65-12 (Sen. Sherrod Brown letter to Corps); Pl.'s Ex. 19 at USA004209–13, ECF No. 65-19 (Corps audit summary).  However, this audit, which reviewed ten years of Caesar Creek billings, resulted in the United States claiming that Ohio owed an additional $187,150.07.  Pl.'s Ex. 19 at USA004210–12; Pl.'s Ex. 16, ECF No. 65-16 (Jan. 24, 2018 adjusted bill for underpayment).

The Corps' audit summary explained that each purchase made for the Project "is assigned a work category code," which "tie[s] each individual cost at the lake to a specific project purpose or purposes."  Pl.'s Ex. 19 at USA004212.  The "four authorized purposes of the lake" through which the Corps "is able to query and separate the joint costs for billing to the State of Ohio" are "flood risk management, natural resource management, water storage, and recreation."  *Id.*  But when the Corps provided Ohio with a list of its expenses following the audit, it did not include the work category codes or budgetary purposes assigned to those expenses.  *See* Pl.'s Ex. 20, ECF No. 65-20 (Caesar Creek joint costs detailed breakdown); Alicia Graham Dep. 118:12–14, 17–23, Pl.'s Ex. 15 at 21, ECF No. 65-15 (describing the document, which shows "detailed costs that [the Corps] ran after the inquiries from the senators" but "does not show" an authorized purpose for any of the costs); Erin Teives Dep. 32:12–16, Pl.'s Ex. 21 at 3, ECF No. 65-21 ("So this doesn't actually show on this printout, but in our system the work item would show . . . a work category code.").[1]

On July 23, 2018, Ohio made a partial payment of the additional fee after it received funds from Wilmington for this purpose. Def.'s Ex. 17, ECF No. 68-18 (Ohio's partial payment and receipt).  The State also requested more information about the "policies and procedures the Contracting Officer uses to determine what costs are included as joint-costs under the Contract." Pl.'s Ex. 26, ECF No. 65-26 (Ohio's second request for information).  Eventually, the United States agreed to credit Ohio $7,906.66 for expenses that it determined were exclusively related to recreation or the Caesar Creek Visitor Center.  Pl.'s Ex. 32, ECF No. 65-32 (email to ODNR summarizing credits); Pl.'s Ex. 31, ECF No. 65-31 (spreadsheet listing credited items and amounts).

In November 2019, the United States sent Ohio two notices of delinquency, totaling $364,965.08, with statements listing an unpaid balance with accrued interest and penalties.  Pl.'s Ex. 33 at OH_007021, OH_007026, ECF No. 65-33 (notices of delinquency).  The notices informed Ohio that failure to pay these outstanding amounts would result in referral to the Treasury Offset Program.  *Id.*  Ohio paid the requested amount under protest.  Pl.'s Ex. 34, ECF

---

[1]  The Court subsequently ordered the United States to provide these codes for any potential litigation regarding damages.  Order (Apr. 7, 2022), ECF No. 55.

No. 65-34 (Ohio letter with payment under protest).  Unable to reach a negotiated resolution, Ohio initiated litigation.

### B.     Litigation History

#### 1.     *Ohio I*

Ohio filed its original Complaint in this court on March 13, 2020, and the case was assigned to Judge Lettow.  *See* Compl., ECF No. 1.  The Complaint claimed seven causes of action: three for breach of contract (for unauthorized O&M charges, lump-sum late billing, and unauthorized interest charges), *id.* ¶¶ 37–44; one for breach of the covenant of good faith and fair dealing, *id.* ¶¶ 45–47; one for declaratory relief, *id.* ¶¶ 48–50; and two alternative causes of action under the Fifth Amendment (for a taking under the Just Compensation Clause and for illegal exaction under the Due Process Clause), *id.* ¶¶ 51–54.  The United States moved to dismiss, contending that the court lacked subject matter jurisdiction over the illegal exaction claim and the claim for declaratory relief, and that Ohio failed to state a claim regarding breach of contract, breach of the covenant of good faith and fair dealing, and the Takings Clause.  Def.'s Mot. to Dismiss at 8–18, ECF No. 9.[2]  Judge Lettow issued an Opinion and Order on September 24, 2020, denying the Motion to Dismiss in all respects, except with regard to the takings claim. *State of Ohio, et al. v. United States* ("*Ohio I*"), 150 Fed. Cl. 173, 179–81 (2020).

#### 2.     *Ohio II*

On January 21, 2021, while the parties were conducting discovery, ODNR received a past-due notice from the Corps for charges incurred under the Contract in February 2020, as well as interest and fees.  Pl.'s Mot. for an Emergency Status Conf. at 1, ECF No. 21.  Ohio filed an Amended Complaint on February 25, 2021, to add this charge.  Pl.'s Unopposed Mot. for Leave to File First Am. Compl. at 1, ECF No. 23; *see* Am. Compl. ¶ 42, ECF No. 23-1.

Ohio followed its Amended Complaint with a Motion for Partial Summary Judgment, seeking to define "joint-use operation and maintenance" as a matter of law.  *See* Pl.'s Mot. Partial Summ. J., ECF No. 26.  The United States filed a Response and Cross-Motion.  Def.'s Resp. and Cross-Mot., ECF No. 32.  It devoted the vast majority of this filing to opposing Ohio's Motion, confining its cross-motion to only one paragraph.  *Compare id.* at 7–11 (Government's opposition), *with id.* at 11–13 (Government's cross-motion).

On June 21, 2021, the court issued an Opinion and Order on the Cross-Motions for Partial Summary Judgment, denying the United States' Motion and granting Ohio's Motion in part.  *State of Ohio v. United States* ("*Ohio II*"), 154 Fed. Cl. 233, 241 (2021).  The court concluded that the contract term "joint-use operation and maintenance costs" means those costs which are "necessary 'to maintain the Project as an efficient going concern, to operate the Project

---

[2]  It is unclear why the United States based its statute of limitations defenses on RCFC 12(b)(6), as the Court of Federal Claims' time bar provided in 28 U.S.C. § 2501 is jurisdictional.  *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008) (describing the Court of Federal Claims' statute of limitations as "jurisdictional" and "more absolute" than "[m]ost statutes of limitations").

effectively' for water storage, water availability, and flood control, or 'to remedy injurious effects resulting from the Project's subsequent operation,' that pertain to more than one purpose of the Project." *Id.* (first quoting *Nampa & Meridian Irrigation Dist. v. Bond*, 268 U.S. 50, 53 (1925); and then quoting *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1284 (2008)) (internal citations omitted).

### 3. Present Motions

After *Ohio II*, the parties resumed discovery, this case was transferred to the undersigned, and the parties exchanged Cross-Motions for Summary Judgment as to the Corps' liability. *See* Order (Sept. 22, 2021), ECF No. 44; Pl.'s Mot.; Def.'s Resp. & Cross-Mot. for Summ. J. ("Def.'s Cross-Mot."), ECF No. 68; Pl.'s Resp. & Reply Supp. Mot. Summ. J. ("Pl.'s Resp. & Reply"), ECF No. 69; Def.'s Reply, ECF No. 73. On August 18, 2022, the Court conducted oral argument on these motions. *See* Hr'g Tr. (Aug. 18, 2022) ("Tr."), ECF No. 75.

## II. Jurisdiction and Standard of Review

### A. Subject Matter Jurisdiction

The Tucker Act grants the Court of Federal Claims jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Although the statute waives sovereign immunity, it does not create a substantive cause of action; "the plaintiff must look beyond the Tucker Act to identify a substantive source of law that creates the right to recovery of money damages against the United States." *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983)); *Mitchell*, 463 U.S. at 216 ("[T]he Tucker Act 'does not create any substantive right enforceable against the United States for money damages.'").

Subject matter jurisdiction is a threshold issue. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). If this Court determines that it lacks subject matter jurisdiction, it must dismiss the action. Rules of the United States Court of Federal Claims ("RCFC") 12(h)(3).

### B. Standard of Review

Pursuant to RCFC 56(a), "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute over such a fact is genuine "if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the burden of demonstrating the absence of a genuine dispute of material fact and must establish its position by "citing to particular parts of materials in the record." RCFC 56(c)(1)(A). The court must consider the evidence cited by the parties but may also consider other materials in the record. RCFC 56(c)(3). "With respect to cross-motions for summary judgment, each motion is evaluated on its own merits and reasonable inferences are

4

resolved against the party whose motion is being considered.  To the extent there is a genuine issue of material fact, both motions must be denied."  *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968–69 (Fed. Cir. 2009) (mem.) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

## III.     Discussion

### A.     Challenges to Jurisdiction

#### 1.     The Court Has Jurisdiction Over Claims Concerning Charges Issued Before July 1, 2008.

The United States Court of Federal Claims has a six-year statute of limitations.  28 U.S.C. § 2501.  Compliance with the statute of limitations is a jurisdictional issue that cannot be equitably tolled or waived.  *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–35 (2008); *Reoforce, Inc. v. United States*, 853 F.3d 1249, 1264 (Fed. Cir. 2017); *Davis v. United States*, 108 Fed. Cl. 331, 339 (2012), *aff'd*, 550 F. App'x 864 (Fed. Cir. 2013) ("The six-year time bar on actions against the United States is jurisdictional, because filing within the six-year period is a condition of the wavier of sovereign immunity in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1).") (collecting cases).

The United States argues that it "is entitled to summary judgment dismissing claims related to any invoices with payment due prior to March 13, 2014, based on lack of jurisdiction" because the invoices before that date are beyond the statute of limitations.  Def.'s Cross-Mot. at 24.  This Court construes the motion as a motion to dismiss because it cannot grant summary judgment on an issue over which it lacks jurisdiction.  The Government bases this argument on the *Ohio I* court's finding that the "Ohio's claims for breach of contract may be broken down into a 'series of independent and distinct events,'" and "the application of the six-year statute of limitations is measured from the date the State of Ohio filed its complaint in this court, March 13, 2020."  150 Fed. Cl. at 179–80 (quoting *Brown Park Ests.-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997)).  The United States adds, however, that "the statute of limitations would not bar consideration of the $187,150.07 retroactive billing adjustment because those charges were due on July 1, 2018."  *Id.* at 24 n.9 (citing Caesar Creek Invoices 2014–2020, Def.'s Ex. at 16, ECF 16-1).

Ohio counters that "all of its claims—dating back to the first bill—are timely" because "Ohio was unaware that the Corps was charging it for costs not allowed by the contract until 2018, when it first received an itemization showing these costs."  Pl.'s Resp. and Reply at 22; *see also* Tr. at 60:3–4 (Ohio counsel claiming a "breach of contract dating back to the Corps' first bill in the mid-nineties").  It relies on the accrual suspension rule, which provides that "a cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence."  *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988) (emphasis omitted).  The State insists that "[b]ecause Ohio did not know about the Corps' breach of the contract until 2018, the statute of limitations period was suspended until 2018, and Ohio's claims are timely."  Pl.'s Resp. and Reply at 22.

Ohio insists that the United States "ignores the second half of the accrual rule, amputating the requirement that a plaintiff know or should have known of its claims before the statute of limitations starts to run." *Id.* But Ohio fails to explain why it should not have known about a potential claim years ago. The United States observes that "the contract specifically provides that 'records of the cost of operation and maintenance of the Project shall be available for inspection and examination by the State,'" and argues that "Ohio could have requested an inspection of those project records at any time, but did not choose to do so until its inspection as part of this litigation." Def.'s Reply at 11. Because the State could "have discovered the basis of its claims had it chosen to exercise its inspection rights under the contract," the Government asserts that "the statute of limitations is not tolled." *Id.* at 12.[3]

"For the accrual suspension rule to apply, the claimant must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was inherently unknowable at the accrual date." *Banks v. United States*, 741 F.3d 1268, 1280 (Fed. Cir. 2014) (cleaned up) (quoting *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008)). Pursuant to Article 5, section (c)(3) of the Water Supply Contract, the State has the right to inspect and examine records of the cost of O&M of the Project. It could have conducted an inspection at any time before 2017 but chose not to exercise this right. "The accrual suspension rule is 'strictly and narrowly applied.'" *Jones v. United States*, 30 F.4th 1094, 1104 (Fed. Cir. 2022) (quoting *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc)). Ohio's rights under the Contract demonstrate that the rule should not apply in this instance. Ohio cannot extend the Court's jurisdiction to claims of which it would have been aware if it had exercised its contractual right earlier. Accordingly, the Court holds that it lacks jurisdiction over any claim concerning charges issued before July 1, 2008.

Regardless, this finding does not affect the charges that the parties most aggressively dispute. As the United States acknowledges, "the statute of limitations would not bar consideration of the $187,150.07 retroactive billing adjustment because those charges were due on July 1, 2018." Def.'s Cross-Mot. at 24 n.9 (citing Caesar Creek Invoices 2014–2020 at 16). That billing adjustment recalculated charges going back to July 1, 2008, *see* Caesar Creek Invoices 2014–2020 at 16, meaning that only charges prior to June 30, 2008, are beyond the Court's jurisdiction.

## 2.    The Court Does Not Have Jurisdiction Over Claims for Declaratory Relief.

Ohio seeks declarations that the United States "may not charge the State of Ohio for charges not authorized by the Water Supply Contract" and "may only charge for expenses necessary to operate the flood control and water storage project, or relieve any injurious effect of

---

[3] This Court holds in Section III, *see infra* p. 17, that the United States breached the implied covenant of good faith and fair dealing by failing to provide adequate recordkeeping and specificity on the nature of the expenses billed by the Corps. Therefore, any inspection by Ohio would likely have been incomplete. But that would not have precluded Ohio from requesting an inspection or raising concerns similar to those at issue in this lawsuit. Though an inspection may not have "easily" led to discovery of the basis of its claims as the Government argues, Def.'s Reply at 12, Ohio failed to exercise its contractual rights to inspect the records in the first place.

that project." Am. Compl. ¶¶ 55–56.  The United States moves to dismiss, claiming that these "requests for declaratory relief are forward looking."  Def.'s Cross-Mot. at 48.  It requests "a declaration on future contract charges that are not incident nor collateral to any judgment for monetary relief in this matter."  *Id.*

The State points out that the *Ohio I* court denied a Motion to Dismiss that was based on the same grounds as the Government's Motion here.  Pl.'s Resp. & Reply at 24; *see* 150 Fed. Cl. at 180.  There, the court explained that Ohio "requested monetary relief as its primary demand" and that "the court has the 'authority to issue rulings of law declaring the rights of parties under a contract where such rulings are necessary to the resolution of a claim for money presently due and owing.'"  *Id.* (quoting *Hydrothermal Energy Corp. v. United States*, 26 Cl. Ct. 7, 16 (1992)).  Thus, this Court possesses authority to grant the relief requested.  *See Pauley Petroleum Corp. v. United States*, 591 F.2d 1308, 1315 (Ct. Cl. 1979) ("[M]erely because the court must make a ruling of law . . . in order to arrive at a money judgment does not render this court's decision a 'declaratory judgment.'"); *Gentry v. United States*, 546 F.2d 343, 346 (Ct. Cl. 1976) (holding that the question of a legal interpretation "arises only incidentally, necessitating an answer by the court in the course of construing the [relevant] statute to determine whether payments is indeed owing to plaintiff").

## B.    Breach of Contract by Billing for Expenses That Are Not for "Joint-Use Operation and Maintenance"

Following a first round of summary judgment motions in this case, the court defined "joint-use operation and maintenance costs" as "those necessary 'to maintain the Project as an efficient going concern, to operate the Project effectively' for water storage, water availability, and flood control, or 'to remedy injurious effects resulting from the Project's subsequent operation,' that pertain to more than one purpose of the Project."  *Ohio II*, 154 Fed. Cl. at 241 (internal citations omitted) (first quoting *Nampa*, 268 U.S. at 53; and then quoting *Casitas*, 543 F.3d at 1284).

The parties now dispute whether the United States charged Ohio for expenses that do not meet this definition—although the United States has also claimed it seeks to "revise" or "clarify" this definition.  *See* Def.'s Cross-Mot. at 24; Def.'s Reply at 7.  First, the parties disagree on whether the United States can charge Ohio for expenses that include recreation as one of multiple purposes.  *Compare* Pl.'s Mot. 22–23, *with* Def.'s Cross-Mot. at 29–31.  Second, they question whether the scope of "operation and maintenance" is limited to costs that facilitate "the physical operation or maintenance *of the dam itself*" as opposed to another facet of the Project, Pl.'s Mot. at 24, or if it instead includes costs that "are necessary to avoid adverse environmental impacts" that "tie back to the loss of habitat and ecological disturbance occasioned by project construction," Def.'s Cross-Mot. at 31, 32.

### 1.    Ohio's Motion

Ohio claims that the United States breached the Contract by "persistently billing Ohio for a wide swath of expenses that fall outside the definition of 'joint-use operation and maintenance costs of the Project.'"  Pl.'s Mot. at 21 (quoting Water Supply Contract, Art. 5 § (c)(3)).  As the State explains, this definition "narrows the universe of costs that can be charged under the

7

contract," but "the Corps ignores these limits." Tr. at 7:23–25. Specifically, it alleges that the Corps billed "for expenses that are not necessary for water supply, water storage, or flood control, and thus are not properly passed on to Ohio" and "for costs that do not pertain to the Caesar Creek Project." Pl.'s Mot. at 21, 24; *see id.* at 26; Pl.'s Resp. & Reply at 10, 12.

The parties agree that the United States cannot bill Ohio for expenses that have a strictly recreational purpose. Pl.'s Mot. at 22; Def.'s Cross-Mot. at 26. Yet, Plaintiff alleges that the Corps nevertheless charged Ohio for recreational expenses by either "recharacteriz[ing] expenses with an obvious recreational purpose as charges related to the Corps' flood control mission" or "characterizing them as 'joint use costs' related to both recreation and one of the remaining Project purposes." *Id.* The State offers several examples of expenses that it contends are wholly or substantially recreational and therefore not chargeable to Ohio under the Contract.

A number of these expenses relate to Caesar Creek's Visitor Center, which Ohio insists "has no nexus to the physical operation or maintenance of the dam itself." *Id.* at 24. The Visitor Center contains "exhibits that explain the history of the Corps, the Corps' regional flood control mission, and the natural and archeological history of the region," and park rangers are stationed there to assist recreational visitors. *Id.* at 6–7. The facility houses a Learning Center where the Corps, ODNR, and others, including recreational visitors, participate in trainings and educational programs. Pl.'s Mot. at 23; James O'Boyle Dep. 32:17–34, Def.'s Ex. 29, ECF No. 68-29. The Visitor Center also houses the regional office for the Corps' Miami River Area ("the MRA office"). That office covers five lakes in Ohio and Indiana and employs personnel who "work under a completely different chain of command from the Project staff and do not report to the Caesar Creek Park Manager." Pl.'s Mot. at 7 (citing O'Boyle Dep. 35).

The Visitor Center expenses at issue are wide ranging. For example, they cover exhibit displays, repairs to a heating and cooling system, bathroom repairs, an American flag set at the Learning Center, electric utilities, and installation and repair of solar panels that are used both for conservation and to teach about solar energy. *Id.* at 23–25. Also at issue are expenses unrelated to the Visitor Center, such as playground mulch and grills for Caesar Creek Park. Pl.'s Resp. & Reply at 11.

Ohio further claims that the United States breached the Contract by billing for expenses related to water safety education and outreach. Pl.'s Mot. at 25–26. O&M bills include line items for water safety promotions at off-site events—such as baseball games and boat shows— and the purchase and cleaning of a costume for "Bobber the Water Safety Dog," a Corps mascot akin to Smokey the Bear. Pl.'s Mot. at 25–26; *see, e.g.*, Pl.'s Ex. 37 at USA1779, ECF No. 65-37 (Caesar Creek joint costs detailed breakdown 2017–2018) (charge for "Cincinnati Boat Show"); Pl.'s Ex. 38 at USA001822, ECF No. 65-38 ($2,415.00 charge for "Bobber the Water Safety Dog Outfit"); O'Boyle Dep. 100:4–101:2 (explaining the Bobber costume's use at events including professional baseball games and events outside of Caesar Creek).

Additionally, the State alleges breach for charges related to environmental stewardship. Pl.'s Mot. at 26–28. This consists of expenses such as birdseed, bird feeders at the Visitor Center, flea collars, a water feature at the Visitor Center, and invasive species removal. *Id.* at 27. It also includes salaries for natural resource specialists, biologists, and archeologists. *Id.*

8

In challenging the validity of these charges, Ohio argues that they "have nothing to do with operating the Caesar Creek Project for water storage, water supply, or flood control." *Id.* at 24. Ohio articulates this contention in a variety of ways, noting that these expenses "do[] not keep the dam running," have "no nexus to the physical operation or maintenance of the dam itself," or "have no relation to the water supply or flood control purposes of the Project and therefore are in breach of the Contract." *Id.* at 24–26. The State's main point is that "if any of these features were eliminated from Caesar Creek, their absence would not prevent the dam itself from operating." *Id.* at 27.

Ohio also alleges that the United States breached the Contract by charging for expenses "unrelated to the Caesar Creek project." *Id.* at 28. The State points to expenses related to the MRA office and Corps projects at other sites. *Id.* As Ohio notes, even the Caesar Creek project manager could not explain why Ohio was billed for a biological study involving another lake in the district, asphalt maintenance at that lake and another, or travel to yet another lake in the district. *Id.* at 30 (first citing O'Boyle Dep. 85, 109, 129–30; and then citing Pl.'s Ex. 20 at USA001585 (itemized costs and labor breakdown 2006–2017)).

The State attributes these alleged breaches to its claim that "[t]he Corps unlawfully bills Ohio based on its internal bookkeeping codes, not based on the contract." Pl.'s Resp. & Reply at 6; *see also* Tr. at 7:23–8:11. It contends that "the Corps ignores the plain language of the contract when deciding what to bill Ohio," instead relying on the categories established in the Corps' business lines, "resulting in unlawful charges." Pl.'s Resp. & Reply at 7; *see also* Tr. at 8:17–19 (Ohio's counsel stating "nowhere does the Government connect its accounting codes, its business lines with the language of the contract").

## 2.    The United States' Motion

The United States maintains in its Cross-Motion that the Corps' billing practices are "authorized by the Contract and the implementing legislation." Def.'s Cross-Mot. at 24 (cleaned up). Regarding recreation charges, the United States insists that "[t]he full history and implementing legislation of the contract necessitate amending the Court's definition of joint-use O&M costs." *Id.* at 25 (quoting *Dalles Irrigation Dist. v. United States*, 82 Fed. Cl. 346, 355 (2008) ("[W]here a contract implements or fulfills a statutory requirement, the interpretation of the contract will be guided by the underlying statute."); *see also* Def.'s Reply at 3. It explains that under the 1958 Water Supply Act, "[s]tate or local interests must agree to pay for an allocated, equitable share of overall project costs, reflecting the benefits of multipurpose reservoir construction." Def.'s Cross-Mot. at 3.

Because a multipurpose project that includes water supply, flood control, and recreation is cheaper than standalone projects undertaken by a state for each of those purposes, the statute and the Contract contemplate Ohio paying 12.7 percent of water supply costs as well as costs that serve both an O&M and a recreational purpose. Tr. at 24:19–21 ("[T]his method of calculation was used [to] . . . set up this pool of costs, and Ohio is getting the benefit of those costs."). Otherwise, the Government argues, the parties would have simply contracted to have Ohio pay 100 percent of costs related to its share of the water supply. *Id.* at 24:23–25:3. In addition to the statutes identified in the Contract, the United States contends that other legislation providing for recreation or recreational facilities should inform the meaning of the Contract.

Def.'s Cross-Mot. at 25 (quoting *Dalles Irrigation Dist.*, 82 Fed. Cl. at 355); *see also* Def.'s Reply at 3; Def.'s Cross-Mot. at 2–5 (listing the Flood Control Act of 1944, Water Pollution Control Act of 1961, and Water Project Recreation Act of 1965).

Further, rather than relying on the definition of "joint-use O&M costs" that the Court found to apply at partial summary judgment, the United States endorses a theory by which "the term 'joint-use O&M costs of the Project' is based on the contract's incorporated separable cost-remaining benefit method of cost allocation. *Id.* at 25–26. Under this method, "joint-use costs are defined as total project costs, less all specific costs." *Id.*

The Government explains that the parties derived Ohio's 12.7 percent payment rate by generating estimates for the proportion of Project costs that would benefit Ohio: expenses for the purposes of flood control, water quality, and water supply. *See id.* at 10–14 (explaining how the Corps used the separable cost-remaining benefit ("SCRB") methodology to establish Project cost estimates). In segregating recreational costs from Ohio's share, the estimates removed only "specific-use" costs that exclusively went toward recreation and included "joint-use" costs that served both recreational and flood control, water quality, or water supply purposes. *See id.* at 24–27 (arguing for a revised definition based on the SCRB methodology); *see also* Tr. at 16:10–17:12 (explaining methodology). As the Government describes, the "Corps adds up the costs assigned to the four O&M business lines, subtracts costs related solely to the recreation purpose, and charges Ohio 12.7 percent of the remaining, joint-use costs of the project." *Id.*

Next, the United States contends that some expenses are appropriately designated O&M because they are necessary to ensure compliance with laws and regulations or to mitigate "adverse environmental harms . . . occasioned by project construction." *Id.* at 30, 32. It argues that many of the Project's "environmental stewardship activities are necessary to avoid adverse environmental impacts and were anticipated in pre-construction design documents." *Id.* at 31. To that end, "Ohio actually filed suit and obtained a preliminary injunction against project construction in 1973, alleging that the loss of tree cover, stream habitat, and other alterations to the natural environment would have significant, adverse environmental effects that the Corps had failed to evaluate under the National Environmental Policy Act." *Id.* at 31 n.11 (citing *State of Ohio ex rel. Brown v. Callaway*, 364 F. Supp. 296, 298-300 (S.D. Ohio 1973), *aff'd in part and rev'd in part*, 497 F.2d 1235 (6th Cir. 1974)).

By example, the United States refers to the requirement that every Army installation fly an American flag outdoors and the need to avoid the "'lamentable' adverse effects of the project, including 'loss of access to archaeological sites' and 'elimination of a free-flowing stream environment.'" *Id.* at 32 (quoting Def.'s Ex. 22 at OH_001860, ECF No. 68-23 (Ohio Environmental Protection Agency memorandum)). One of the Corps' 30(b)(6) witnesses even testified that archeologists, biologists, and geologists ensure compliance with various federal requirements, such as the National Historic Preservation Act, the National Environmental Policy Act, the Endangered Species Act, and others. Amy Babey 30(b)(6) Dep. 142:9–143:11, 144:23–146:24, Def.'s Ex. 35, ECF No. 68-35.

3.     **The United States Breached the Contract by Issuing Bills for Unauthorized O&M Costs.**

a.  **The United States' request for a "revised" definition of "joint-use O&M costs"**

The Court previously clarified that the phrase "joint-use O&M costs" means those costs which are "necessary 'to maintain the Project as an efficient going concern,' 'to operate the Project effectively' for water storage, water availability, and flood control, or 'to remedy injurious effects resulting from the Project's subsequent operation,' that pertain to more than one purpose of the Project."  *Ohio II*, 254 Fed. Cl. at 241 (internal citations omitted) (first quoting *Nampa*, 268 U.S. at 53; and then quoting *Casitas*, 543 F.3d at 1284).

In its Motion, the United States urges the Court to adopt a new interpretation of this key phrase based on the Corps' SCRB methodology.  Def.'s Cross-Mot. at 25; *see also* Tr. at 12:12–17 ("[W]e are asking the Court to reiterate that the prior definition for joint use O&M is broader than the way Ohio characterizes that definition.").  Ohio argues that the Court should not entertain this new approach because the Government fails to meet the standard for a motion for reconsideration, forfeited its argument by failing to raise it at partial summary judgment, and offers a substantively flawed argument that does not actually change the definition of joint-use O&M.  Pl.'s Resp. & Reply at 3–6.  Indeed, the United States had everything it needed to argue for this interpretation at partial summary judgment in 2021.  *See* Def.'s Cross-Mot. at 10–14 (describing the accounting method the Corps used to estimate Project costs and determine Ohio's 12.7 percent share), 24–27 (asserting that the statutes and accounting method warrant revision of the term "joint-use O&M"); *see also* Pl.'s Resp. & Reply at 4–5 & n.1.

Although the United States should have made this argument earlier, a court may consider a contention that is "not a new claim . . . but a new argument to support what has been [a party's] consistent claim."  *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995).  It may also consider new issues that are "inextricably linked" with the issue at hand.  *City of Sherill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 214 n.8 (2005); *see* Melissa M. Devine, *When the Courts Save Parties from Themselves: A Practitioner's Guide to the Federal Circuit and the Court of International Trade*, 21 Tul. J. Int'l & Comp. L. 329, 337 (2013).  Here, both parties point to the definition given in *Ohio II* to bolster their interpretation of joint-use O&M costs.  *See* Tr. at 12:22–13:1 (Government counsel arguing "we're not really asking for the Court to change [the definition] . . . we're simply explaining that the way Ohio reads that decision is reading too much into that holding as if it was an endorsement of Ohio's position"); *id.* at 7:15–24 (Ohio's counsel highlighting that *Ohio II* "narrows the universe of costs that can be charged under the contract"); *id.* at 14:24–15:1 (Government counsel stating that "the way Ohio is arguing is that costs should only apply to water supply, but Judge Lettow determined that joint use applies to more than one contractually specified use").

The Court does not find the United States' interpretation of the definition persuasive.  Neither the Contract nor the design memorandum Defendant cites suggest that Ohio understood that the SCRB methodology applied when the parties signed the Contract.  And even if Ohio understood this methodology as it applied to generating cost estimates under Exhibit B of the Contract, it would not necessarily mean that the same accounting decision applies to annual bills.

In contrast, *Ohio II*'s reasoning remains sound.  The Contract's plain language states that Caesar Creek is "a 'multi-purpose project' with the goals of 'flood control,' 'water quality control,' and 'water supply.'"  *Ohio II*, 154 Fed. Cl. at 238 (quoting Water Supply Contract Ex. B).  In light of these express purposes, *Ohio II* held that "[t]he statutory provisions authorizing the parties to enter into this Contract, combined with *Nampa* and *Casitas*, indicate that 'operation and maintenance costs' should be interpreted as those necessary . . . for the Project's water storage, water availability, and flood control purposes."  *Id.* at 239.

For these reasons, the Court will not disturb the definition of "joint-use O&M costs" articulated in *Ohio II*.  254 Fed. Cl. at 241.  Whether an expense meets that definition determines whether it establishes liability for breach of contract.

### b.  Application of the existing definition

The dispute concerns hundreds of line items which the parties have grouped into categories and descriptors.  For example, Ohio argues that "environmental stewardship" expenses are billed improperly, and that flood control codes are actually for recreation and therefore violate the Contract.  *See, e.g.*, Pl.'s Mot. at 26–27.  The United States generally relies on the same categorization of costs.  *See* Def.'s Cross-Mot. at 31–32.

The Court will not make line-item liability determinations.  To assess whether either party is entitled to summary judgment, the Court considers whether expenses fell outside the three requirements for expenses under Article 5 of the Contract: "[T]he contracting officer cannot charge Ohio for costs that are not joint use, not for operation and maintenance, or not related to the Caesar Creek Project."  *Ohio II*, 154 Fed. Cl. at 238.

### i.  Related to the Caesar Creek Project

Pursuant to the Contract, the United States may only bill Ohio for expenses that are related to the Project.  *Id.*  Expenses that are wholly unrelated, or whose relationship to Caesar Creek is too tenuous, run afoul of this limitation.  Expenses incurred at another location, or for travel to another location, likely do not relate to the Project.  For these expenses, the United States must prove that the costs directly and tangibly benefit one of the Caesar Creek Project's O&M purposes.

### ii.  Operation and maintenance

In addition to the requirement that expenses must relate to the Project, they must also be for operation and maintenance.  Ohio argues that a variety of expenses fail this standard because they "do[] not keep the dam running." Pl.'s Mot. at 22, 24.  But *Ohio II* defined operation and maintenance costs as those "necessary 'to maintain the Project as an efficient going concern,' 'to operate the Project effectively' for water storage, water availability, and flood control, or 'to remedy injurious effects resulting from the Project's subsequent operation.'"  *Ohio II*, 154 Fed. Cl. at 241.  While these categories include expenses that "make the dam run," the cases from which *Ohio II* derived its definition demonstrate that they are also broader.

In *Casitas Municipal Water District v. United States*, the plaintiff argued that a fish ladder installed to facilitate the migration of the endangered West Coast steelhead trout should

not count as an O&M cost because it was "not related to the water supply functions" of a reclamation project. 543 F.3d at 1285. The Federal Circuit disagreed. It held that the fish ladder "ensur[ed] that the Project could continue to operate without violating [the Endangered Species Act]" because operating the dam without either installing a fish ladder or obtaining an "incidental take permit" would have threatened the survival of the fish and subjected the plaintiff to civil and criminal liability. *Id.* at 1285.

*Casitas* relies on *Nampa & Meridian Irrigation District v. Bond*, which similarly held that a drainage system designed to mitigate flooding caused by an irrigation system project was chargeable as an O&M cost. 268 U.S. at 53–54. This drainage system was necessary to operate the project effectively and "overcom[e] injurious consequences arising from the normal and ordinary operation" of the irrigation system. *Id.* These cases clarify that the phrase "operation and maintenance" goes beyond the basic running of the dam and includes certain costs that indirectly maintain the Project as an "efficient going concern" or "remedy injurious effects" of its operation. *Ohio II*, 154 Fed. Cl. at 241 (first quoting *Nampa*, 268 U.S. at 53; and then quoting *Casitas*, 543 F.3d at 1284).

Furthermore, because such injurious effects are not necessarily confined to the dam's physical infrastructure, neither is the scope of O&M necessary to remedy these effects. As one federal court explained about Caesar Creek, dam construction "convert[ed] a free-flowing stream into an impounding lake behind a dam and spillway," which caused "[b]iosystems that flourish in the former environment [to be] replaced by those that flourish in a stillwater lake." *Ohio ex rel. Brown v. Callaway*, 364 F. Supp. 296, 298 (S.D. Ohio 1973), *aff'd in part and rev'd in part*, 497 F.2d 1235 (6th Cir. 1974). Accordingly, the Project's maintenance obligations extend beyond the dam itself and instead encompass the new ecosystems created by its construction.

In line with *Ohio II*, the scope of O&M includes costs for purposes intended to:

- "Keep the dam running," directly serving the purposes of flood risk management, water supply, and water quality;

- Maintain, repair, or replace equipment that is used in efforts to "keep the dam running" or train personnel to perform these functions;

- Prevent, mitigate, or correct for negative effects on the physical environment or biosystems caused by the construction, repair, or O&M of the dam; or

- Ensure that dam operations, the physical premises of the Caesar Creek Project, and structures that are used for O&M comply with any applicable law or regulation.

These categories of expenses fit within the rubric of O&M, although it is not enough merely to tack an O&M justification onto an otherwise recreational purpose. If the relationship between an expense and an O&M function is too tenuous, it should not be allocated as an O&M cost.

### iii.   Joint-use

Finally, O&M costs must be "joint-use" under the Contract.  The Court previously clarified that this means they must "pertain[] to more than one contractually specified use."  *Ohio II*, 154 Fed. Cl. at 239.  Recreation is, expressly, not a contractually specified use: the Contract carves it out as a "specific use" that stands in contrast to the "joint-use" costs that further the purposes of flood control, water quality, and water storage.  Water Supply Contract at USA000011.  Thus, to comply with the Contract, an expense may only serve the joint uses of water quality, water supply, and flood control that were contemplated by the parties.  Expenses that implicate recreation, even if they also address another Project function, violate the Contract.

For the purposes of the Contract, a "cost" is not necessarily coextensive with a purchase or an item.  Rather, a cost is that portion of a monetary transaction that is allocated to a particular purpose.  The parties advocate for competing relationships between joint use and recreation.  *See, e.g.*, Tr. at 15:2–3 (Government counsel arguing that, under joint use, "a cost can apply to both recreation and water supply or recreation and something else and still be a cost that is allowed under the contract"); *id.* at 31:24–32:3 (Ohio counsel advocating the opposite).  These interpretations are too susceptible to gamesmanship.  They invite strategic purchasing practices and battles over the real purpose of a purchase.  At the contracting stage, neither party would have bargained for such an interpretation.

To effectuate the intent of the parties, the Contract must allow the United States to charge 12.7 percent of all O&M costs, and Ohio must be free of any responsibility to pay for non-O&M costs.  This means that the parties need to reconcile items acquired, or labor undertaken, for both recreational and joint-use O&M purposes, whether through proration, designating a primary purpose of each expense, or some other method.

### c.   The United States charged Ohio for unauthorized joint-use O&M costs.

The Court holds that the United States breached the Contract by charging Ohio for unauthorized O&M costs and Ohio is entitled to summary judgment on this claim.  The record demonstrates that the United States charged Ohio for two types of expenses that are not related to the Project.

The first type of unrelated costs are for the MRA office.  Although the office shares some resources with Project staff, it has its own workspace and its own chain of command.  MRA staff supervise, and travel to, other Corps projects and their workspace at Caesar Creek is physically separated from the "project office" where employees who operate the dam work.  The offices even operate on separate utility meters.  O'Boyle Dep. 92:24–93:5.  Thus, there should be no difficulty in billing the entities individually.

Travel and water safety promotion efforts are similarly unrelated expenses.  The United States billed Ohio for costs associated with water safety promotion efforts beyond Caesar Creek, including at baseball games, boat shows, and parades.  The relationship between general water safety and the specific Caesar Creek Project is too tenuous to fit within the Contract.

There is potentially a third type of unrelated expense: charges for other Corps projects. Ohio points to charges for asphalt maintenance and a water study at other Corps lakes, as well as visits to other Corps sites.  Pl.'s Mot. at 29–30; Pl.'s Resp. & Reply at 13.  The United States asserts that the study was also conducted at Caesar Creek and the other costs might have covered activities there, but that the Corps may have left out or cut off this explanation on the bills sent to Ohio.  Def.'s Reply at 9–10; Tr. at 20:7–12, 21:19–24.  If damages discovery does not bear out these assertions, such expenses further establish liability, as a more direct link is necessary for an expense to fall within the parameters of the Contract.

Overall, the Corps breached the Contract by billing for certain charges that are not sufficiently related to the Project.  The parties also dispute several other charges that are related to Caesar Creek but may or may not fall within the definition of joint-use O&M purposes.  As the parties have contemplated, the Court will allow the parties to address whether these charges contribute to the United States' liability at the damages stage of litigation based on the guidance provided in this Opinion.

Ohio also brought an illegal exaction claim as an alternative to its contract theory. Because the United States is liable for breach of contract, that claim is moot.  *See* Am. Compl. ¶ 58 (stating that Ohio presents illegal exaction "[i]n the alternative to [its] other Causes of Action"); Def.'s Cross-Mot. at 49–50.  "It has long been the policy of the courts to decide cases on non-constitutional grounds when that is available, rather than reach out for the constitutional issue. . . .  [W]hen a plaintiff is awarded recovery for the alleged wrong under one theory, there is no reason to address the other theories."  *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1368 (Fed. Cir. 2009) (citing *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009)).

### C.   Breach of the Implied Covenant of Good Faith and Fair Dealing

#### 1.   The Parties' Motions

In addition to its claims regarding the express terms of the Contract, Ohio alleges that the United States violated the implied covenant of good faith and fair dealing.  Pl.'s Mot. at 34–39; Pl.'s Resp. & Reply at 18–22.  "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement."  *Alabama v. North Carolina*, 560 U.S. 330, 351 (2010) (quoting Restatement (Second) of Contracts § 205 (1981)).  Conduct that may breach the implied covenant includes "subterfuges and evasions" and "interference with or failure to cooperate in the other party's performance."  *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988)). "In general, though, 'what that duty entails depends in part on what that contract promises (or disclaims).'"  *Metcalf*, 742 F.3d at 991 (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 830 (Fed. Cir. 2010)).  The implied covenant of good faith and fair dealing does not expand contractual rights or obligations, and it "is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value."  *Id.*

Ohio claims that the United States violated the duty of good faith and fair dealing in two ways.  First, it argues that the United States' record-keeping failed "to provide sufficient

information and explanation for charges." Pl.'s Mot. at 35. For example, it notes that bills for rangers' salaries do not provide specific information about the tasks they carry out. *Id.* at 35–37. Ohio also discusses multiple charges titled "travel order" and "mileage and rental," that lack any description of the expense incurred. *Id.* at 37. Second, Ohio alleges that the Corps maintained "arbitrary billing practices and fail[ed] to ensure compliance with the Contract." Pl.'s Mot. at 3438. The State claims that the Corps' billing process is "fraught with subjectivity and completely disregards the Corps' Contract with Ohio." *Id.* It points to testimony from Corps staff who do not recall receiving any training or guidance on how the Contract applies to purchasing or coding determinations and refers to a park ranger who did not know that Ohio paid a percentage of O&M costs. *See, e.g.*, *id.* at 38–39 (highlighting testimony of Corps employee who "wasn't aware of any policy, procedure, or authority" for her decisions on O&M costs).

For the first claim, the United States asserts that "[w]hat Ohio is really arguing . . . is that the Corps did not cooperate to the level that Ohio is now claiming is proper, despite the fact that the Corps made every effort to provide Ohio with any necessary information during contract performance." Def.'s Cross-Mot. at 43. In the Government's view, Ohio is attempting to incorporate into the Contract a duty of specificity that exceeds its actual requirements, even though the implied covenant "cannot expand a party's contractual duties beyond those in the express contract, or create duties inconsistent with the contract's provisions." *Id.* at 43–44 (first citing *CanPro Invs. Ltd. v. United States*, 131 Fed. Cl. 528, 531 (2017); and then citing *Precision Pine*, 596 F.3d at 831).

Regarding the second claim, the United States asserts that "[n]ot only are Ohio's arguments not supported by the facts, but they are also . . . redundant of their breach of contract arguments." *Id.* at 47. Defendant notes that "[w]here a contract provides other avenues for relief 'that preempt the need to invoke the doctrine of good faith and fair dealing,' there is 'no justification for invoking an extra-contractual duty of good faith that would be redundant of the duty imposed by that clause.'" *Id.* at 47 (quoting *BGT Holdings LLC v. United States*, 984 F.3d 1003, 1016 (Fed. Cir. 2020)).

## 2. The United States Breached the Duty of Good Faith and Fair Dealing.

The Court holds that the United States breached the implied covenant of good faith and fair dealing. Accordingly, Plaintiff is entitled to summary judgment on this claim.

First, the United States failed to sufficiently maintain records. Pursuant to the Contract, the United States is obligated to make "[r]ecords of the cost of operation and maintenance of the Project . . . available for inspection and examination by the State." Water Supply Contract, Art. 5 § (c)(3). Under this Provision, the records must be clear enough to indicate the nature of the expenses. Otherwise, Ohio's right to review the records is meaningless.

The United States may be correct that the Contract does not require it to keep records "in a particular format or include [a] specific justification." Def.'s Cross-Mot. at 44 (citing Water Supply Contract, Art. 5 § (c)(3)). But even without specific requirements, records must be usable. *Id.* Here, the records are not. Even the park manager, who is responsible for approving purchase requests, testified that the records are "[c]lear as mud." O'Boyle Dep. 76:12. Moreover, the United States is incorrect that "nothing in the contract requires or invites Ohio's

16

scrutiny of individual costs."  Def.'s Reply at 5.  The purpose of the Contract's inspection and
examination clause is to invite scrutiny, yet the United States maintained ambiguous records that
require reconciliation through group meetings and discussions.  As Government counsel
recognized, itemization of the billing costs does not consistently include all information, and the
Corps' own budget process "obviates the need for doing a line item by line item analysis."  Tr.
at 22:3–6, 17:19–20.  Indeed, this litigation required bifurcation into liability and damages
phases, in part because more specific discovery is necessary for the parties and the Court to
know what was billed in each line item.

Second, the United States also violated the implied covenant by maintaining arbitrary
billing practices.[4]  Two Corps employees explained the process by which the Corps determines
whether a particular expense is categorized as O&M.  In a 30(b)(6) deposition, Amy Babey
extrapolated on the Corps' labyrinthine process: "[t]he staff at the project office as well as the
supervisor at the project office along with that first level program analyst and that second level
resource management reviewer will all ensure that [billing decisions] are consistent with what
was defined in the work package."  Babey 30(b)(6) Dep. 49:8–14.  She insisted that "[o]nce a
charge is made—an expenditure is made or a [purchase request] is developed, it will flag or it
will be tied to that work category code, so that is where the decision is.  It takes the subjectivity
out of it."  Id. 47:14–18.

But James O'Boyle, the Corps' Caesar Creek park manager, described a process with
substantial subjectivity.  He stated that, "[t]here are times when [employees] do talk about
[coding purchases], and there are times when, in my judgment, they get it wrong, and we try and
correct those."  O'Boyle Dep. 67:9–12.  For example, he explained how birdseed exists in a
"gray area" because it can serve a recreational or natural resource purpose.  Id. at 67:16–68:15.
He "believe[d] it got charged to natural resources" but acknowledged that "you can make an
argument for both."  Id. at 68:2–3, 11–12.  Further, while employees receive fiscal law training,
the issue of what to consider "given this contract" has "never been mentioned, to [O'Boyle's]
recollection."  Id. at 70:2–13; 72:15–19.

The record demonstrates that the resulting decisions are arbitrary.  Mr. O'Boyle could
only "guess" or "speculate" about the appropriate business line for multiple expenses, including
invasive species removal, electric utilities, off-site events to promote water safety, and solar
panels.  See, e.g., id. at 90:2–12 ("I would have to guess, but I would say probably most of
[invasive species control] is charged to flood damage reduction."), 93:9–22 ("[M]y guess would
be [electric billing is] almost exclusively under FRM, flood reduction management."),

---

[4]  At oral argument, Plaintiff's counsel conceded that this argument includes "substantial
overlap" with its allegations for unauthorized O&M costs.  Tr. at 51:23.  The Court recognizes
that it should not reach the implied covenant if it would be "redundant" of duties the Contract
expressly creates.  See BGT Holdings LLC v. United States, 984 F.3d 1003, 1016 (Fed.
Cir. 2020).  Nonetheless, arbitrary billing practices, as opposed to arbitrary application, is better
suited to the claim concerning the implied covenant of good faith and fair dealing.  An arbitrary
billing practice may or may not result in charges that violate the express terms of the Contract,
but the lack of a useful standard represents its own failure.  Like the charges' lack of
transparency, their arbitrariness burdens Ohio's ability to exercise its right to inspect and
examine the contracting officer's records.

118:22–119:9 ("I couldn't say with certainty [how a boat show is billed].  I mean, I can speculate."), 124:1–5 ("[T]here's two lines on [solar panels], again, I'm going to guess, because maybe we use two different lines, two different business lines to pay for it, but that would be just a guess.").

The Court does not doubt that these employees earnestly apply their best judgment when faced with "gray area" expenses, but where there is no clear guidance informing that judgment, the process is arbitrary.  It should not require discussion among several employees or "guessing" to know whether an expense is appropriate.  The opacity of the Corps' records and reasoning does not allow Ohio to exercise its contractual right to meaningfully inspect them.  And the Corps' billing process is arbitrary.  Accordingly, the United States has violated the implied covenant of good faith and fair dealing, and Plaintiff is entitled to summary judgment on this claim.

### D.    Breach of Contract by Issuing Corrected Bills for Periods Pre-Dating the Most Recent Billing Year

Ohio claims that the United States breached the Contract "by assessing a lump sum retroactive charge of $187,150.07 after deciding that its own cumulative billing errors from 2007 to 2017 resulted in a shortfall."  Pl.'s Mot. at 30.  The United States insists that the Contract permits corrections to bills over a several-year period.  Def.'s Cross-Mot. at 34–37.  The dispute concerns the proper interpretation of Article 5, section (c)(2), which describes the schedule for billing O&M costs.  The first bill is pro-rated, after which:

> Annual payments will be due and payable in advance on the 1st day of July thereafter.  Payments following the first complete fiscal year of operation shall be increased or decreased in an amount to reflect the difference between the prior payment for operation and maintenance and the actual experienced joint-use costs of operation and maintenance for the prior years.

Water Supply Contract, Art. 5 § (c)(2).

Ohio argues that "the Contract only allows adjustments based on the preceding year's experienced costs, and only when the current bill is issued," and it "allows for an adjustment only to 'reflect the difference between prior year's payment and the actual experience joint use operations and maintenance' costs."  Pl.'s Mot. at 31 (quoting Water Supply Contract Art. 5 § (c)(2)); *see also* Tr. at 36:22–24; 37:14–21.  The United States counters that "Ohio's reading of the plain language completely ignores the plural word 'years' at the very end of the contract clause."  Def.'s Cross-Mot. at 35.  This "indicates that payments will be adjusted to reflect the difference between the prior year's payment, and the actual experienced costs for multiple prior *years*."  *Id.*  It contends that, "[a]ccordingly, the contract does not limit . . . the possible retroactive adjustment to just *one* year (singular), but allows for adjustments based on actual costs for multiple years."  *Id.*

The use of the plural word "years" is unambiguous.  Ohio discounts its significance by pointing to "payments," a different plural word elsewhere in the provision.  *See* Pl.'s Reply at 14.  This is unpersuasive.  While Ohio attempts to read ambiguity into the phrase "[p]ayments

following the first complete fiscal year," the meaning is clear: each annual payment following the first annual payment. The "s" in "payments" does not change the Corps' ability to bill for multiple "prior years." *See* Water Supply Contract Art. 5 § (c)(2)). The United States did not breach the Contract by issuing corrected bills covering a multiple-year period. Accordingly, it is entitled to summary judgment on this claim.

### E.     Breach of Contract for Charging Interest on Overdue O&M Charges

Ohio claims that the United States also breached the Contract by charging one percent interest on unpaid O&M charges, plus another six percent for any amount more than 90 days delinquent. Pl.'s Mot. at 32 (citing Pl.'s Ex. 16 (2018 adjusted bill for underbilling)). These interest payments were applied to unpaid O&M charges, not the bill resulting from the ten-year audit. *See* Tr. at 50:1–4. Ohio argues that including an interest provision for project investment costs in the Contract, compared to the absence of an equivalent provision in the O&M section, indicates an intent to apply interest only to the former. Pl.'s Mot. at 32–33. *Compare* Water Supply Contract Art. 5 § (a) (project investment costs), *with id.* § (c)(2) (O&M payments).

The United States cross-moves, contending that, while the Debt Collection Act does not apply in this case, "states are still required to pay interest pursuant to Federal common law, based on weighing 'the competing federal and state interests.'" Def.'s Cross-Mot. at 38 (quoting *United States v. Texas*, 507 U.S. 529, 536 (1993)).[5] It relies on *Royal Indemnity Co. v. United States* for the proposition that "[t]he Supreme Court has long held that the rules governing whether the United States can collect interest due as a result of unpaid contractual obligations are to be determined by the Federal courts." Def.'s Cross-Mot. at 38 (citing 313 U.S. 289, 296 (1941)). It further looks to *West Virginia v. United States* for the notion that "[t]he United States is also entitled to collect *pre-judgment interest* on unpaid debts arising out of a contractual obligation." Def.'s Cross-Mot. at 38–39 (citing 479 U.S. 305, 310, 311 (1987)). After comparing *West Virginia* to the present case, it contends that "the Corps is entitled to collect pre-judgment interest on unpaid O&M bills." *Id.*[6]

---

[5]  The United States actually misconstrues Ohio as arguing "that the Debt Collection Act of 1982, codified at 31 U.S.C. § 3711 *et seq.*, bars the Corps from collecting interest on any unpaid bills under contracts executed before October 25, 1982, making the charges [] unlawful." Def.'s Cross-Mot. at 38. In fact, Ohio argued that "the text of the Act plainly states that it does not apply" to the Water Supply Contract. Pl.'s Mot. at 33.

[6]  Ohio argues that "[t]he Corps' designated RCFC 30(b)(6) representative could not point to any legal authority justifying these charges . . . [or] any provision in the Contract authorizing the charging of interest and penalties." Pl.'s Mot. at 33 (citing Roxanne Keeling 30(b)(6) Dep. 20–21, Pl.'s Ex. 41, ECF No. 65-41). The United States requests that the Court strike that part of the brief because "[i]nformation concerning the Government's legal positions is beyond the scope of a 30(b)(6) deposition" and fact witnesses cannot set forth the legal position of the United States under the Federal Rules of Evidence. Def.'s Cross-Mot. at 41–42 n.16. While Ohio is correct

But as Ohio explains, the cases the United States cites concern prejudgment interest. Pl.'s Resp. & Reply at 16. "[P]rejudgment interest requires a judgment" because "[a]fter all, it is 'interest to be recovered as damages.'" *Id.* (quoting *West Virginia*, 479 U.S. at 308); *see also West Virginia*, 479 U.S. at 310 n.2 ("Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress."); *Seaboard Lumber Co. v. United States*, 48 Fed. Cl. 814, 836 (2001) (stating that "the purpose of awarding interest" is "compensating the non-breaching party for the loss of the use of money").

The United States would be within its rights to sue Ohio and seek prejudgment interest along with damages, but it cannot charge interest when it does not even claim a contract-related injury and cannot point to any other provision of law by which it would be entitled to interest. Under *West Virginia*, "parties owing debts to the Federal Government must pay prejudgment interest *where the underlying claim is a contractual obligation to pay money*." *West Virginia*, 479 U.S. at 310 (emphasis added). But the United States "has not filed suit (or a counterclaim) against Ohio, has not obtained a judgment, and has not been awarded prejudgment interest on that judgment," Pl.'s Resp. & Reply at 17, nor has it indicated an intent to do so. This key factor distinguishes the instant case from *United States v. Texas*.

And while the Government is correct that a judgment had not yet occurred in *Texas*, *see* Tr. at 46:13–21, in that case, the United States had "informed [Texas] that prejudgment interest would begin to accrue." 507 U.S. 529, 532 (1993). Rather than demanding immediate payment, the United States put Texas on notice that it would owe interest in the event of an eventual lawsuit. In the instant case, the United States demanded that interest and late fees be paid without any nexus to a potential lawsuit. Instead, the only notice Ohio received was its referral to the Treasury Offset Program and statement that interest applied on the bill for correction. *See* Pl.'s Ex. 16 at USA001583.

With no indication that the United States intended to sue for damages, any right to collect interest would need a foundation in the Contract itself. The United States does not demonstrate that any such right exists. By seeking interest unconnected to a monetary judgment, the United States breached the Contract, and Ohio is entitled to summary judgment on this claim.

## IV. Conclusion

As the Court noted at oral argument, the Corps and Ohio have an ongoing relationship, and the same problems of Contract application are likely to arise again in the future. Tr. at 33:20–34:6. Given the "vague" nature of the Contract, future conflict seems possible. *See,*

---

that some of the United States' cited authorities are inapplicable because they focus on the deliberative process privilege, the United States is similarly correct that asking a fact witness to opine on "legal authority justifying" an action is improper. *See* Fed. R. Evid. 701(c) (providing limitations on non-expert witness testimony); Keeling 30(b)(6) Dep. 20–21 (documenting United States' objections to deposition questions that call for legal conclusions). Rather than striking that paragraph of the motion—an action with a high bar under RCFC 12(f)—the Court opts not to assign the passage any weight.

*e.g.*, *id.* at 53:16 (Government counsel describing the Contract as "vague").  As the proceeding moves into the damages phase, the Court encourages the parties to work together to establish a dispute resolution process for expenses that are challenged in the future, as well as other issues that may arise in the course of the contractual relationship.  Alternatively, the parties should consider amending the Contract to clarify its terms.

      For the reasons outlined above, the Court issues the following rulings:

1. Defendant's Motion to Dismiss claims concerning payments due before July 1, 2008, is **GRANTED**;

2. Defendant's Motion to Dismiss claims for declaratory relief is **DENIED**;

3. Plaintiff's Motion for Summary Judgment on liability for breach of contract by issuing unauthorized O&M charges is **GRANTED**; Defendant's Motion for Summary Judgment on liability for breach of contract by issuing unauthorized O&M charges is **DENIED**;

4. Plaintiff's claim for illegal exaction is **DISMISSED**; Defendant's Motion for Summary Judgment on liability for illegal exaction is **DENIED** as moot;

5. Plaintiff's Motion for Summary Judgment on liability for breach of the implied covenant of good faith and fair dealing is **GRANTED**; Defendant's Motion for Summary Judgment on liability for breach of the implied covenant of good faith and fair dealing is **DENIED**;

6. Plaintiff's Motion for Summary Judgment on liability for breach of contract by issuing corrected bills for periods older than the most recent billing year is **DENIED**; Defendant's Motion for Summary Judgment on liability for breach of contract by issuing corrected bills for periods older than the most recent billing year is **GRANTED**;

7. Plaintiff's Motion for Summary Judgment on liability for breach of contract by charging interest on overdue payments is **GRANTED**; Defendant's Motion for Summary Judgment on liability for breach of contract by charging interest on overdue payments is **DENIED**.

      **IT IS SO ORDERED.**

                                   s/ Carolyn N. Lerner
                                  CAROLYN N. LERNER
                                  Judge